# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-DR-00167-SCT

*MARLON LATODD HOWELL a/k/a MARLON COX*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/2001 |
| TRIAL JUDGE: | HON. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM O. RICHARDSON |
| | JIM WAIDE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JAMES M. HOOD, III |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | APPLICATION FOR POST-CONVICTION RELIEF IS DENIED IN PART AND GRANTED IN PART - 08/28/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. Marlon Latodd Howell was convicted by a Union County jury of killing Hugh David Pernell during an attempted robbery. The jury found Howell guilty of capital murder and then found that he should be sentenced to death. On Howell's direct appeal to this Court, we affirmed his capital murder conviction and sentence of death. *Howell v. State*, 860 So. 2d 704 (Miss. 2003). The United States Supreme Court initially granted certiorari and then

dismissed Howell's petition as improvidently granted. *Howell v. Mississippi*, 543 U.S. 440, 125 S. Ct. 856, 160 L. Ed. 2d 873 (2005).

¶2. Howell now seeks post-conviction relief (PCR) pursuant to Mississippi Code Annotated Sections 99-39-1 - 99-39-29 (Rev. 2007) raising numerous issues. Upon a review of the claims raised in the petition, we find that Howell has established that he is entitled to an evidentiary hearing on certain grounds; therefore, his PCR petition is granted in part and denied in part.

## RELEVANT FACTS AND TRIAL COURT PROCEEDINGS

¶3. The facts of this case are fully set out in our decision on direct appeal. *See Howell*, 860 So. 2d at 712-15. We thus set out only those facts necessary for today's discussion.

¶4. In the early morning hours of May 15, 2000, Hugh David Pernell, a newspaper carrier, was shot and killed in his car on Broad Street in New Albany while running his newspaper route. The shooting occurred in front of Charles Rice's house. Rice would later tell law enforcement that he had heard two cars on the street in front of his house at around five o'clock in the morning. He looked out his window and saw two vehicles, one behind the other, stopped in the street. A man exited the rear car and approached the driver's side window of the front vehicle. After some commotion, the man pulled a pistol and shot the driver of the front vehicle. The shooter then got back in the passenger seat of the rear vehicle and left the scene. Pernell suffered a single gunshot wound to the chest and died at the scene. Rice immediately called 911 and reported the shooting and later told law enforcement

2

officers that the shooter was a young black male who had fled the scene in a late model, dark-colored Oldsmobile.

¶5. Law enforcement officers received an anonymous tip that Curtis Lipsey was involved in the murder. The investigation revealed that Lipsey, Adam Ray, and Marlon Howell had been riding around together throughout the previous night and the early morning hours of the day of the shooting. Ray's grandmother owned a dark Oldsmobile Cutlass. Upon questioning, Ray and Lipsey implicated Howell. Howell was arrested and claimed that he had no involvement in the murder. Howell told officers that he had been in Corinth with a woman at the time of the killing; however, he was unable to provide a name or an address for this woman. After Howell's arrest, Rice identified Howell in a police line-up.

¶6. A Lorcin .380 caliber pistol was found in the bushes behind Brandon Shaw's house. Forensic testing indicated that the bullet that killed Pernell was fired by this Lorcin pistol. A shell casing found near the windshield of Pernell's car was consistent with that weapon but could not be positively matched.

¶7. Shaw testified that Howell, Ray, and Lipsey had come to his house in the dark Oldsmobile Cutlass in the early morning hours after the shooting. Shaw and Lipsey testified that they had seen Howell with an object wrapped in a shirt under his arm. Shaw and Lipsey testified that they had seen Howell walking out from behind the house where the pistol was later found. Shaw told the police chief that he had seen Howell go behind the house carrying something. While at Shaw's house, Adam Ray told Shaw and others that "Marlon had shot somebody." The trial court found that the statement by Ray in Howell's presence amounted

3

to an adoptive admission when Howell did not renounce the statement. After the shooting, Howell got a ride to Blue Mountain with Shaw, and during the drive, Howell told Shaw not to tell anyone what had happened.

¶8. The State alleged that Howell had killed Pernell in a robbery attempt. Marcus Powell testified that Howell had told him on the night of the killing that he needed money to pay his probation officer and that he was going to have to "make a sting" in order to get the money. Shaw also testified that Howell had commented on robbing a man at a gas station earlier that night.

¶9. Ray and Lipsey pleaded guilty to manslaughter and armed robbery in the killing of Pernell. As part of his plea agreement, Lipsey was to offer truthful testimony at any subsequent trial related to Pernell's killing. At Howell's trial, Lipsey testified that Howell had shot Pernell, and Lipsey also corroborated Powell's testimony that Howell had said that he needed money in order to pay his probation officer the next day or else they would not see him around anymore. Lipsey also testified that Howell had flashed the car's lights at Pernell to get Pernell to pull over.

¶10. At his trial, Howell presented an alibi defense by offering as witnesses his father and sister, who testified that Howell had been at home in the early morning hours of May 15, 2000. Howell presented no evidence that during the relevant time surrounding Pernell's killing, he had been with a woman in Corinth.

4

¶11.    In his PCR petition, Howell raises numerous issues, and thus our discussion of these issues follows.

## I.    WHETHER THE STATE FAILED TO DISCLOSE EXCULPATORY INFORMATION ABOUT CHARLES RICE.

¶12.    Unquestionably, the State's critical witness at trial was Charles Rice, who testified that he saw Howell shoot Pernell on Broad Street.  Howell claims that the State withheld relevant information about Rice which would have discredited his testimony against Howell at trial.  In his petition, Howell asserts that Rice had been incarcerated in Illinois in the early 1980s; that he had been affiliated with gangs while in prison; that he had perjured himself about his work history; that he was a drug user at the time of the killing; and that he knew Howell from previous encounters.  Prior to trial, Howell's attorneys filed a motion entitled "Rule 9.04 Motion" in which the defense sought general discovery material from the State. *See* Uniform Rule of Circuit and County Court Practice 9.04. Notably, the defense requested information concerning the criminal history of Howell and his co-defendants. There was no specific request for information about any other witness's criminal history.

¶13.    It is well established that the State had the duty to turn over all exculpatory material relevant to Howell's case.  The United States Supreme Court has stated that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady v. Maryland***, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-

97, 10 L. Ed. 2d 215, 218 (1963). *See also **Howard v. State***, 945 So. 2d 326, 337 (Miss. 2006); ***Simon v. State***, 857 So. 2d 668, 699 (Miss. 2003).

¶14.    In order to establish a ***Brady*** violation, the defendant must show: (1) that the State possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence and could not have obtained it himself with reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. ***Howard***, 945 So. 2d at 337; ***King v. State***, 656 So. 2d 1168, 1174 (Miss. 1995).

¶15.    Howell alleges that the State failed to disclose that Rice had been arrested several times; that he had been convicted of burglary; and that he had been incarcerated in Illinois in the 1980s, during which time he was a member of a prison gang.  The State presents the affidavit of Kelly Luther, the assistant district attorney who prepared the case against Howell. Luther says that he never sought a criminal background check for Rice and that the defense never asked for a criminal background check on Rice prior to trial; however, Luther states the State turned over all discoverable evidence, exculpatory or not, to the defense.  Both the trial court record and the post-conviction-proceedings record are devoid of any evidence indicating that the State withheld information that would have been about Rice's criminal history.   As to Howell's claim that the State failed to disclose information helpful to the defense about Rice's criminal background, we find that Howell has failed to show that the State possessed the information or that the State suppressed that information.  Alternatively,

6

Howell argues that the State should have run a criminal background check on Rice; however, Howell cites no authority which would require the State to run criminal checks on every prosecution witness. Therefore, we are under no obligation to review this issue. ***Dampier v. State***, 973 So. 2d 221, 228-29 (Miss. 2008) (citing ***Glasper v. State***, 914 So. 2d 708, 726 (Miss. 2005)).

¶16. We also note that Rice's felony conviction occurred in 1983, almost seventeen years before Pernell was murdered. Whether impeachment of Rice concerning his seventeen-year-old conviction for burglary would have been admissible is doubtful. *See* Miss. Rule of Evid. 609 ("Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement . . . ."). There is nothing in the record to indicate "that the probative value of the conviction supported by the specific facts and circumstances substantially outweigh[ed] its prejudicial effect." Miss. R. Evid. 609(b). *See* ***Tate v. State***, 912 So. 2d 919, 924 n. 6 (Miss. 2005); ***Jones v. State***, 776 So. 2d 643, 651-52 (Miss. 2000). We find that the State was not required to obtain the criminal history on all its witnesses, especially when there was no such request by the defense for this information.

II. **WHETHER THE STATE FAILED TO DISCLOSE IN DISCOVERY INFORMATION CONCERNING RICE'S TESTIMONY THAT HE DID NOT KNOW HOWELL PRIOR TO THE SHOOTING.**

¶17. Howell maintains that Rice knew Howell prior to the killing and that his testimony to the contrary at trial was false. Interestingly, Howell's argument at the post-conviction

7

stage – that Rice's identification of Howell was untrustworthy because he had seen him before – is totally at odds with his argument on this issue at trial. In his closing argument at trial, Howell's attorney argued that Rice did not know Howell "from Adam" and that his unfamiliarity with Howell rendered the identification less believable.

¶18. In support of these allegations, Howell submits several affidavits and one unsworn written statement. We give the unsworn statement little weight. *See **Puckett v. State***, 879 So. 2d 920, 940 (Miss. 2004). Howell does present substantially identical affidavits from Mary Simmons and Tulane Simmons who claim that they live near Rice and that "there is no way" that Rice had not seen and "known of" Howell prior to the shooting. Both affiants changed the wording of their statements from alleging that Rice knew Howell to allegations that Rice "knew of" Howell. The State argues that the affidavits do not support Howell's claim that Rice knew Howell prior to the shooting.

¶19. Howell makes several claims here which are completely unsubstantiated. There is no evidence that the State had any knowledge that Rice might have "known of" Howell. There is no indication that the State failed to disclose any exculpatory information. Other than the somewhat vague claims that Rice "knew of" Howell, there is no substantial evidence before us that Rice testified untruthfully in his identification of Howell.

¶20. Howell further argues that whether Rice had seen Howell on prior occasions raises reasonable doubt about Rice's eyewitness identification of Howell; however, we are mindful that today's case is a post-conviction proceeding. Rice's credibility has been weighed by the jury and the jury's determination of guilt has been affirmed on direct appeal; therefore, we

8

will not consider this issue further in these post-conviction proceedings. Mississippi Code Annotated Section 99-39-21 provides that issues either raised at the trial phase or capable of being raised in those proceedings are not properly reviewed in the post-conviction stage. This statute states in pertinent part:

> (1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.
> . . .
> (3) The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.

*See also* **Lynch v. State**, 951 So. 2d 549, 551 (Miss. 2007); **Wiley v. State**, 750 So. 2d 1193, 1198 (Miss. 1999); **Foster v. State**, 687 So. 2d 1124, 1129 (Miss. 1996). We thus find that issues related to Rice's reliability as a witness are procedurally barred.

### III.  WHETHER RICE'S IDENTIFICATION OF HOWELL WAS RELIABLE.

¶21.    Howell alleges that Rice's identification of him was flawed because the lighting at the scene was poor. Howell also claims that the State "misrepresented the conditions at the time of the shooting" as to the distance from Rice's window to Pernell's car. Howell further alleges that "Petitioner has now discovered evidence that the State's star witness who stated in his trial testimony that he was in the process of smoking a cigarette when he supposedly witnessed the shooting was smoking marijuana and may have been under the influence of a controlled substance at the time he observed the shooting of Mr. Pernell."

9

¶22. As discussed *supra*, issues related to Rice's identification of the shooter are res judicata and are procedurally barred. Miss. Code Ann. § 99-39-21 (Rev. 2007). Visibility issues and Rice's opportunity to view the shooting were explored at length at trial. Evidence was presented that the shooting took place approximately seventy-one feet from Rice and that Rice's view of the crime was unobstructed. The State showed that, although at the time of the shooting, conditions were "predawn," there was considerable light from several sources, including streetlights, porch lights, and perhaps most importantly, the headlights of the vehicle driven by Howell's cohort. In Howell's direct appeal, this Court found that "[u]nder the totality of the circumstances, there is no likelihood whatsoever that Rice's identification was not reliable." ***Howell,*** 860 So. 2d at 731. As to the assertion of Howell's counsel that Rice was smoking marijuana on the morning of the shooting, the only statement supporting that claim is the unsworn, handwritten statement of a New Albany resident who claims to know Rice, and we give that claim via an unsworn statement little weight.

¶23. Howell presents an affidavit from a professor of psychology who opines that conditions for a positive identification of the shooter were "highly unfavorable" based on the lighting, the distance to the shooting, and the fact that Rice is white and Howell is African-American. We note several flaws in the professor's analysis. First, the professor claims that the shooting happened forty-five minutes before dawn. Actually, the shooting happened approximately forty-two minutes before actual sunrise but as was discussed at trial, twilight begins much earlier. The professor claims that the shooter "mostly had his back to Mr. Rice as he was walking from this car to where the shooting took place." Even if this statement is

10

true, the professor ignores the fact that the shooter was facing Rice at the time of the actual shooting.

¶24.    The professor also claims that the lineup was biased. The professor incorrectly states that the lineup was a five-person lineup, whereas the record reveals that there were in fact six subjects in the lineup. This issue was addressed at trial and on direct appeal and is procedurally barred. Miss. Code Ann. § 99-39-21 (Rev. 2007). In the direct appeal, this Court reviewed the five factors for determining whether a lineup is impermissibly suggestive as set out in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We found that the line-up was not unduly suggestive and that evidence from the lineup was properly admitted. *Howell*, 860 So. 2d at 730-31. Therefore, we decline to again consider this issue via these post-conviction relief proceedings.

### IV.    WHETHER HOWELL'S ATTORNEYS WERE INEFFECTIVE CONCERNING RICE'S IDENTIFICATION OF HOWELL.

¶25.    Howell asserts that his trial attorneys did not effectively represent him concerning Rice's identification and testimony. Howell was represented at trial by Duncan Lott and Jak Smith. Lott, who was Howell's primary attorney, sets out that he has been practicing criminal law in Mississippi since 1977 and that he had represented three capital-murder defendants before Howell.

11

¶26. Lott submitted an affidavit in which he claims that the State should have disclosed information about Rice's criminal record, incarceration record, and evidence of drug use.[1] As noted *supra*, there is no evidence that the State had any knowledge of Rice's criminal record and then suppressed that information. The assistant district attorney has sworn that no criminal background check of Rice was performed. Lott also states that "exculpatory evidence concerning Mr. Rice's criminal background would have allowed me to impeach the only eyewitness to this crime." However, contrary to Lott's statement that Rice was the only eyewitness to this crime, the record reveals that Curtis Lipsey also was an eyewitness to the shooting, and Lipsey likewise identified Howell as the killer.

¶27. The standard for determining if a criminal defendant received constitutionally effective counsel is well-established. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his attorney's actions were deficient *and* that the deficiency prejudiced the defense of the case. *Strickland*, 466 U. S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

---

[1] The record is silent as to real evidence concerning Rice's alleged drug use. Howell's only submission on this issue is the unsworn statement of Timothy Gilliam and the hearsay statements of others through an investigator.

12

***Stringer v. State****, 454 So. 2d 468, 477 (Miss. 1984), citing ****Strickland****, 466 U.S. at 687. The

focus of the inquiry must be whether counsel's assistance was reasonable considering all the

circumstances. ****Id.****

> Judicial scrutiny of counsel's performance must be highly deferential. (Citation omitted) . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

***Stringer*** at 477; citing ***Strickland****,* 466 U.S. at 689. Defense counsel is presumed competent.

***Washington v. State***, 620 So. 2d 966 (Miss. 1993).  This Court has likewise stated:

> Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Mohr v. State****,* 584 So. 2d 426, 430 (Miss. 1991).  This means a "probability sufficient to undermine the confidence in the outcome." ***Id.***

. . .

> There is no constitutional right then to errorless counsel. ***Cabello v. State****,* 524 So. 2d 313, 315 (Miss. 1988);  ***Mohr v. State****,* 584 So. 2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial;  defendant just has right to have competent counsel).  If the post-conviction application fails on either of the ***Strickland*** prongs, the proceedings end. ***Neal v. State****,* 525 So. 2d 1279, 1281 (Miss. 1987);  ***Mohr v. State****,* 584 So. 2d 426 (Miss. 1991).

***Davis v. State****,* 743 So. 2d 326, 334 (Miss.1999), citing ***Foster v. State****,* 687 So. 2d 1124,

1130 (Miss. 1996).

¶28.    Howell's attorneys did not specifically request information about Rice's criminal history. The attorneys did request general discovery and all *Brady* exculpatory information. *Brady*, 373 U. S. at 87. The State's attorney maintains that all discoverable information was released to the defense and that the State had no duty to run a background check on Rice and then to turn over information not even requested by the defense.

¶29.    As we have noted, Rice pleaded guilty to burglary in 1983. Pernell's murder and Rice's testimony against Howell occurred nearly seventeen years later. The impeachment value of Rice's 1983 conviction, even if admissible, would have been minor. *Jones*, 776 So. 2d at 651-52.

¶30.    Howell also asserts that his attorneys were ineffective in failing to discover that Rice knew him prior to the shooting. As already noted, Howell presents somewhat suspect affidavits that Rice must have "known of" Howell. Defense counsel argued during closing that Rice's identification was not reliable because he had never before seen Howell. We certainly cannot find that defense counsel's argument was illogical inasmuch as this argument could have been based upon a trial-strategy decision to argue to the jury that Rice's identification testimony was highly suspect because Rice did not know Howell. Strategic decisions of trial counsel are presumed to be reasonable. *Cabello v. State*, 524 So. 2d 313, 319 (Miss. 1988)

¶31.    After a full review of the trial-court record, we are unable to find that Howell did not receive effective assistance of counsel on these issues. Rice was examined thoroughly and extensively about his identification of Howell. Counsel for Howell cross-examined Rice at

14

length about the lighting and other visibility factors. We thus find that the actions of Howell's trial counsel were not deficient pursuant to *Strickland*.

### V. WHETHER RICE HAS RECANTED HIS TESTIMONY.

¶32. In June of 2005, the investigator for Howell's post-conviction counsel procured an affidavit from Rice in which Rice recanted his trial testimony and stated that "I have a very real and substantial reasonable doubt as to whether or not Marlon Howell is the man I saw that morning . . . ." Thereafter, Rice reaffirmed his trial testimony by a new affidavit executed in October of 2007. Rice's 2007 affidavit states in pertinent part:

> At [Marlon Howell's] trial I positively identified Marlon Howell as the person who shot and killed Mr. David Pernell. I hereby reaffirm that testimony and declare it to be true. I have previously given a statement to an investigator acting on the behalf of Marlon Howell wherein I called into question the accuracy of my identification of Marlon Howell as the person who shot David Pernell. I was being married in the week that I signed that statement and I signed the statement as a result of continuous pressure that was applied to me by the investigator and other persons acting on behalf of Marlon Howell. I was not aware of the legal significance of the statement that I gave them wherein I called into question the accuracy of my identification of Marlon Howell, and this statement was given in an attempt to make the persons acting on the behalf of Marlon Howell to leave me and my wife alone during the time of our marriage. After signing the above mentioned statement I met with the attorney for Marlon Howell, an investigator for Marlon Howell, Tim Kent, who was formerly a New Albany police officer and Ben Creekmore who is the District Attorney for Union County, at the New Albany City Hall and stated to both [sic] of them that my identification of Marlon Howell at the trial was correct and that I was standing by that testimony, and that I had given that

15

statement in an attempt to make the persons acting on the behalf of Marlon Howell leave me alone.  I am today reaffirming my identification of Marlon Howell as the shooter of David Pernell.

The State also includes an affidavit from Ben Creekmore, the present district attorney, who states that he attended a meeting with Rice and defense counsel in which Rice reaffirmed his trial testimony.  On the other hand, Howell maintains that Rice's recanted testimony entitles him to post-conviction relief and a new trial.

¶33.   As a general rule, recanted testimony is "exceedingly unreliable, and is regarded with suspicion; and it is the right and duty of the court to deny a new trial where it is not satisfied that such testimony is true."  *Bradley v. State*, 214 So. 2d 815, 817 (Miss. 1968). Further, "[e]xperience teaches all courts a healthy skepticism toward recanted testimony . . . ." *Yarborough v State*, 514 So. 2d 1215, 1220 (Miss. 1987).  The fact that a witness changes his testimony after the trial does not necessarily entitle the petitioner to a new trial. *Russell v. State*, 849 So. 2d 95, 107 (Miss. 2003) (citing *Peeples v. State*, 218 So. 2d 436, 438 (Miss. 1969); *Williams v. State*, 669 So. 2d 44, 53 (Miss. 1996)).

¶34.   In the direct appeal of Howell's capital-murder conviction and death sentence, we held that Rice's identification of Howell was reliable and that the jury was entitled to weigh the credibility of the evidence. *Howell*, 860 So. 2d at 731.  Unquestionably, Rice's testimony was crucial to the State's case.  The State admitted as much in closing argument when the prosecutor stated that the State could have rested after Rice testified.  After reviewing Rice's trial testimony, the 2005 affidavit in which he partially recanted his identification of Howell, and the 2007 affidavit in which he reaffirmed his trial testimony, we find that Howell has

16

shown that he is entitled to a post-conviction hearing on this issue. This issue can be resolved by the trial judge, who will have an opportunity not only to hear Rice's testimony, but also to observe Rice's demeanor as Rice is subjected to both direct examination and cross-examination. This also is certainly true of other witnesses who might testify on this issue.

### VI. WHETHER THE STATE COERCED ADAM RAY AND CURTIS LIPSEY INTO PROVIDING FALSE STATEMENTS AND ILLEGALLY SUPPRESSED LIPSEY'S INITIAL STATEMENT.

¶35. Under these three issues, Howell alleges that the State improperly coerced statements from Howell's co-defendants. Howell claims that law enforcement officials improperly threatened Ray and Lipsey and that both Ray and Lipsey were intoxicated at the time their statements were taken. Issues related to the propriety of the interrogations or the admissibility of any statements provided by Ray and Lipsey either were litigated at trial and on appeal or were capable of being raised in previous proceedings. Those claims therefore are barred here. Miss. Code Ann. § 99-39-21 (Rev. 2007). Howell presents affidavits from Ray and Lipsey in which both claim that their statements were not freely given. The statements Ray and Lipsey provided to law enforcement officers, which they claim were coerced, were never entered into evidence at trial. Even assuming *arguendo* that law enforcement officials coerced unused statements from Ray and Lipsey, we find no prejudice to Howell.

¶36. Additionally, Ray did not even testify at trial. The only statement attributed to Ray at trial was during Brandon Shaw's testimony that when Ray, Lipsey, and Howell came back

17

to Shaw's house after the shooting, Ray had said that Howell had shot someone. That statement, made in Howell's presence and not denied or discounted by Howell, was admitted into evidence as an adoptive admission. This Court found that Ray's statement was properly admitted pursuant to Mississippi Rule of Evidence 801(d)(2)(B). *Howell v. State*, 860 So. 2d at 736. Ray's statement has been fully reviewed and adjudicated by this Court. Further review is prohibited in post-conviction proceedings.

¶37.   In his post-conviction affidavit, Ray claims that he was too intoxicated on the night in question to know who shot Pernell and that the police tricked him into implicating Howell. Ray never claims in his affidavit that Howell did not shoot the victim. The only indication of any coercion in Ray's affidavit is his statement that he would not have told the police anything if the police had not told him that Howell was implicating him in the shooting. Even if the police did attempt to trick Ray by claiming that Howell was cooperating with law enforcement officials, this fact alone would not entitle Howell to any relief. There is no requirement that law enforcement officials be absolutely honest when interrogating a suspect. "Ploys to mislead a suspect or lull him into a false sense of security" are permissible during police questioning, as long as they do not "rise to the level of compulsion or coercion." *Illinois v. Perkins*, 496 U.S. 292, 297, 110 L. Ed. 2d 243, 110 S. Ct. 2394 (1990). The statement Ray gave to law enforcement officials was not even introduced into evidence at trial. We find no evidence of any relevant compulsion or coercion, especially in light of the fact that Ray did not testify at trial. Howell also somewhat disingenuously claims that the State took efforts to keep Ray from testifying and being subject to cross-examination. Ray

18

was available to both sides. Howell and his attorneys could have called Ray had they so chosen.

¶38. Howell also now claims that Curtis Lipsey was coerced into implicating him. Again, the only evidence offered of any coercion is that law enforcement officials told Lipsey that Howell had given a statement that Lipsey was the shooter. As discussed *supra*, such action on the part of law enforcement was not impermissible. At the time of the statement, Lipsey signed a waiver of rights in which he claimed that he had not been threatened or coerced.

¶39. Howell also claims that the State improperly destroyed Lipsey's initial statement in which he had disclaimed any responsibility for the killing. At trial, Lipsey admitted that his first statement had been untruthful. He testified that he had denied involvement in an attempt to "get out of it." This matter was discussed fully at trial and is now procedurally barred. Miss. Code Ann. § 99-39-21 (Rev. 2007). Even if it were not barred, we find that no relief is warranted. Lipsey testified that even in his initial statement, he had said that Howell was the shooter. The only change between the first statement and the second statement is related to Lipsey's own culpability as opposed to Howell's culpability.

## VII. WHETHER COUNSEL WERE INEFFECTIVE CONCERNING ISSUE VI.

¶40. We have found Issue VI to be without merit. We also find that Howell has made no showing of ineffective assistance of counsel as to issues related to the statements of Ray and Lipsey. This issue is thus without merit.

19

## VIII. WHETHER THE PURPORTED RECANTATIONS OF CURTIS LIPSEY AND ADAM RAY MERIT AN EVIDENTIARY HEARING.

¶41.    Howell alleges that his two co-defendants have changed their stories and now swear that they do not know who killed Pernell. We are again reminded that recanted testimony is inherently unreliable. *Bradley*, 214 So. 2d at 817; *Yarborough*, 514 So. 2d at 1220.

¶42.    We note that both Lipsey and Ray are presently incarcerated after pleading guilty to manslaughter in the killing of Pernell. Their present claims that they do not know who killed Pernell are contradicted not only by their initial statements to police and, in Lipsey's case, by trial testimony, but also by their guilty pleas. Lipsey stated under oath during his guilty-plea hearing that Marlon "pulled out a gun and shot" Pernell and that Howell's intention at the time was to rob the man. Lipsey also testified under oath at Howell's trial that he saw Howell shoot Pernell and that the motive was robbery. During his guilty-plea colloquy, Ray claimed that they were looking for someone to rob; that Howell had flashed the car's lights to get Pernell to stop; and that although he did not see the actual shooting, he did see Howell talking to Pernell. Ray then heard a gunshot and Howell immediately jumped back in the car.

¶43.    In his affidavit, Lipsey admits that he, Ray, and Howell were together on the night Pernell was killed. Lipsey now claims that he does not know who killed Pernell since he did not see the weapon or the shooting. He claims that he told law enforcement that Howell was the shooter only because he was confused due to intoxication and because law enforcement officials threatened him. In the waivers of rights signed when they were questioned, both

20

Ray and Lipsey stated that no threats had been made and no pressure or coercion of any kind had been used against them. No specific threat is mentioned in Lipsey's affidavit other than his statement that law enforcement officials had told him that he would get a death sentence or life imprisonment if he did not cooperate. Even if true, such statements by law enforcement would not render Lipsey's statement inadmissible.

¶44. Notably, Lipsey's current statement does not include any claim that Howell did not kill Pernell. Lipsey's present testimony is simply that he did not see the killing. Lipsey's claim that he was intoxicated when he was interrogated is insignificant based on the record before us. Lipsey claims that he drank "until 3:30 or longer;" however, he was not questioned until 6:30 p.m., approximately fifteen hours later. Lipsey's statement to law enforcement was not introduced into evidence; however, Lipsey testified at Howell's trial, and he unquestionably does not claim that he was intoxicated at the time he testified at trial that Howell was the shooter.

¶45. Adam Ray's recantation is even more suspect than Lipsey's recantation. In his current statement, Ray admits that he, Lipsey, and Howell were together "riding around" on the night of the crime. In stating that it was too dark to see from Rice's house to the street at the time of the shooting, Ray admits that he, Lipsey, and Howell were at the scene of the killing. Importantly, Ray does not claim that Howell did not shoot Pernell, but instead, Ray's claim now is merely that he did not see anyone with a gun that night and that he never would have said that Howell was the shooter if law enforcement officials had not tricked him by telling him that Howell had implicated him. Ray never testified at trial, and his only appearance in

21

the proceedings involved the adoptive admission in which Brandon Shaw testified that Ray had said in Howell's presence that Howell had shot a man.

¶46. We note the apparent contradiction in Howell's current position. At trial and even now, Howell's argument has been that Lipsey or Ray was the actual murderer. Yet in his petition, Howell relies on affidavits from both, one of whom he claims must be the actual killer. Lipsey claims that he does not know who the shooter was, but it may be implied from his affidavit that Lipsey is in essence stating that Howell or Ray was the shooter. Likewise, Ray claims no knowledge of who shot Pernell, but according to Ray, the only possibilities as to the killer are Lipsey and Howell. Thus, according to Howell's affidavits, either Howell is the killer or one of his affiants is necessarily lying in his affidavit.

¶47. In light of the general untrustworthiness of recanted testimony and in consideration of the totality of the circumstances of the affidavits and the record before us, we find that the current affidavits of Ray and Lipsey wherein they recant previous statements or prior testimony do not entitle Howell to any relief.

### IX. WHETHER THE STATE COERCED OTHER WITNESSES INTO PROVIDING FALSE TESTIMONY AGAINST HOWELL.

¶48. Concerning this issue, Howell alleges that the State improperly coerced statements from Brandon Shaw, Tonya Peterson and Terkecia Pannell. Peterson and Pannell did not testify at trial. The actions of law enforcement officials in the questioning of Peterson and Pannell have no relevance here.

22

¶49. Shaw testified at trial that, prior to the killing, he had been riding around Tupelo with Ray, Lipsey, and Howell, and that Howell had made a comment about robbing a man at a gas station who was "an easy lick." Shaw refused to participate, and no robbery occurred at that point. Shaw later went home, and Howell, Ray, and Lipsey left without him. Shaw also testified that several hours later, Howell, Ray, and Lipsey returned to Shaw's house in the dark Oldsmobile. Shaw testified that Ray had stated that Howell had shot somebody. Shaw further testified that he never saw Howell with the gun but that Howell had something wrapped in a green shirt under his arm after the shooting. Shaw told law enforcement officials that he had seen Howell walk from behind his house where the gun was later found. Shaw then drove Howell to Blue Mountain, and when he dropped Howell off, Howell told him not to tell anyone.

¶50. In his affidavit, Shaw now recants parts of his prior testimony. Shaw does not recant his trial testimony about the adoptive admission when Ray claimed that Howell had shot someone; however, Shaw now attempts to clarify some of his trial testimony. Shaw claims that after he drove Howell home, Howell unwrapped the shirt from his hand and no gun was inside. Shaw's new statement still coincides with the proof offered at trial where it was shown that the gun was found at Shaw's house and must have been left there before Shaw drove Howell to Blue Mountain. Shaw also claims that Ray and Lipsey told him that the gun was behind the house and that he never saw Howell go behind the house. Shaw further claims that his testimony concerning Howell's comments about robbing the man at the gas station have been misconstrued. He now claims that "[w]hen I told the police that [Howell]

23

mentioned there goes an easy lick in Tupelo that was meant to say sell someone fake drugs or to trick them . . . Marlon did not mean robbery with a gun." Shaw's current statement is belied by his trial testimony:

> Prosecutor: What happened there [in Tupelo] when you went by the gas station?
> Shaw: That is when he made the comment about robbing the man that was standing outside.
> Prosecutor: When you say he who do you mean by he?
> Shaw: Marlon.
> Prosecutor: What exactly was said?
> Shaw: He said . . . there go an easy lick right there.

The trial record clearly reveals that the comments about an easy lick referred to a robbery and not a drug scam.

¶51. Shaw also claims that he was pressured by law enforcement and that the process was "scary and unbelievable." No specifics of the alleged pressure have been provided. Shaw does not claim that he was threatened in any way.

¶52. We find that Shaw's current statement is highly suspect and that Howell has not made a sufficient showing that an evidentiary hearing concerning Shaw's testimony is necessary. Therefore, we find this issue has no merit.

> **X. WHETHER THE STATE VIOLATED *BATSON v. KENTUCKY* AND WHETHER A JUROR CONCEALED INFORMATION DURING THE JURY SELECTION PROCESS.**

¶53. Howell has withdrawn these claims and further discussion is not required.

> **XI. WHETHER APPELLATE COUNSEL FAILED TO PRESERVE A FEDERAL ISSUE RELATED TO A LESSER-OFFENSE INSTRUCTION.**

24

¶54. Here, Howell raises two claims of ineffective assistance of counsel. Howell first maintains that, although his attorneys at trial and on appeal raised issues related to a lesser-offense instruction, they failed to raise a federal claim along with those issues. This Court addressed in detail whether Howell was entitled to a lesser-offense instruction on simple (non-capital) murder or manslaughter and found that such an instruction was not supported by the evidence. *Howell v. State*, 860 So. 2d at 741-744. After the United States Supreme Court granted Howell's petition for certiorari, that Court found that "Petitioner's brief in the State Supreme Court did not properly present his claim as one arising under federal law." *Howell v. Mississippi*, 543 U.S. 440, 443 125 S. Ct. 856; 160 L. Ed. 2d 873 (2005). The United States Supreme Court then dismissed the petition.

¶55. Howell maintains that, in not raising a federal claim, his attorneys were constitutionally ineffective. In showing that his attorneys failed to raise a federal issue which would have been reviewable in the Supreme Court or other federal courts, Howell has made a facial showing that counsel's performance was deficient. But the second prong of the *Strickland* test requires a showing that the deficient performance by the attorneys also prejudiced the defense. *Strickland*, 466 U. S. at 687. In the direct appeal, this Court found that under Mississippi law and the evidence presented at trial, Howell was not entitled to a lesser-offense instruction. Even after further review of *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), this Court finds that no lesser-offense instruction was required. In *Beck,* the U.S. Supreme Court determined that the death sentence may not be imposed after a jury verdict of guilty of a capital offense where the jury was not permitted

25

to consider a verdict of guilt of a lesser offense. *See* ***Goodin v. State***, 787 So. 2d 639, 655 (Miss. 2001). This Court has held ***Beck*** to be inapplicable to this state's statutory capital-murder sentencing scheme where the sentence is untied to the conviction and the jury is entitled to sentence a convicted defendant to death, life without parole, or life with parole. *Id.* *See also* ***Jackson v. State***, 684 So. 2d 1213, 1228 (Miss. 1996).[2]

¶56.    In the end, we find that Howell has not shown that his attorneys were constitutionally ineffective as to this issue and thus this issue is without merit.

> **XII.    WHETHER THE STATE MISREPRESENTED HOWELL'S INDIGENT STATUS ON APPEAL OR, ALTERNATIVELY, COUNSEL WERE INEFFECTIVE IN FAILING TO SECURE A FINDING OF INDIGENCE BY THE TRIAL COURT, AND WHETHER COUNSEL FAILED TO SEEK AND OBTAIN FUNDING FOR VARIOUS DEFENSE EXPERTS.**

¶57.    Howell was represented at trial by Duncan Lott, who was assisted by Jak Smith. Apparently, Lott agreed to represent Howell pro bono as a favor to Howell's father. Whether Howell was entitled to expert funds was contingent on whether Howell was indigent. In his concurring opinion on Howell's direct appeal, Justice Waller, joined by three other justices and in part by an additional justice, would have found that an otherwise indigent defendant is entitled to expert funding even if that defendant is being represented by an attorney pro bono. ***Howell***, 860 So. 2d at 765 (Waller, J., concurring). However, Justice Waller's opinion

---

[2]Even though life with parole is no longer an option under our parole laws, the same analysis applies because death is not an automatic sentence upon conviction of capital murder.

makes clear that no error was committed in that Howell suffered no prejudice in the refusal to provide expert funds. *Id.*

¶58.   Howell now claims that in the direct appeal, the State misrepresented to the Court that Howell was not indigent.  He provides an affidavit from the attorney who represented Howell prior to Lott's entry into the case.  That attorney states that he was appointed to represent Howell in preliminary proceedings and that he never would have been appointed if there had been no finding of indigence. After that attorney ceased his representation of Howell, the trial judge entered an order allowing attorneys' fees and expenses.  The order recites that the attorney is to be paid "incident to his representation of the above named indigent."  For reasons unknown, neither Howell nor the State mentioned that order in the original briefing of this matter.  Despite that order, the State, in its response to the petition, maintains that "the petitioner could not cite to [sic] any instance in the record supporting his claim of indigence." The State apparently maintains that, since Howell was later represented by a pro bono attorney of his choosing, the previous finding of indigence had been extinguished. In light of that order, it is apparent that this Court's finding that Howell had never been determined to be indigent was erroneous.

¶59.   Howell claims that his attorneys should have sought money from the state in order to retain defense experts who would have been able to testify about (1) lighting and defense perception, (2) fingerprint analysis, and (3) firearms ballistics.  The State maintains only that Howell was never declared to be indigent and that the state was therefore not required to provide any funding for the procurement of defense experts.

27

¶60. On direct appeal, this Court found that "[s]ince Howell did not proceed as an indigent or have the trial court declare him to be an indigent, there is no authority to require the State to fund his request for defense expenses." *Howell v. State*, 860 So. 2d at 721. As noted *supra*, the finding in the direct appeal that Howell had not been declared to be indigent is incorrect. Howell had in fact been found to be indigent. The fact remains, however, that in order to be entitled to state-funded experts, Howell was required to show an actual, specific need for those experts. *Loden v. State*, 971 So. 2d 548, 563-564 (Miss. 2007) *See also Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984) ("[a]n indigent's . . . right to defense expenses . . . is conditioned upon a showing that such expenses are needed to prepare and present an adequate defense."); *Green v. State*, 631 So. 2d 167, 171-72 (Miss. 1994) ("Concrete reasons for requiring an expert must be provided by the accused."). This Court on direct appeal found no prejudice to Howell.

¶61. Howell claims that he was entitled to a lighting-and-perceptions expert who might have discredited Rice's identification of Howell as the shooter. That expert's affidavit has been discussed previously. The expert states that Rice's identification was suspect because of the lighting, the distance to the subject, the relative positioning of the parties, and because Rice is white and Howell is black. As we stated in our discussion of Issue III, *supra*, this issue was fully discussed and resolved on direct appeal, and alternatively, for the reasons stated, this issue has no merit.

¶62. Howell also now presents the affidavit of a fingerprint expert. The State's fingerprint expert testified at trial that several partial fingerprints had been lifted from the window area

of Pernell's vehicle but that "there were no prints of value that could be compared to anyone to make an identification." Howell's expert now claims that one of the partial prints lifted from Pernell's vehicle was detailed enough for analysis. He claims that the print "appears to be" part of the left index finger and part of the left middle finger of some unknown person. He states that the print lifted from Pernell's vehicle has "a couple" of distinct features and that those distinct features can be distinguished from Howell's known prints. We find that the fingerprint expert's assertions, even if assumed to be true, do not require an evidentiary hearing on these issues. There was no testimony that Howell ever touched the window post of Pernell's car. The fact that Pernell himself or any other unknown person might have left a print on the car at some point prior to the shooting does not lead to a conclusion that Howell was not the shooter. The fingerprint testimony would have been of minimal assistance to the defense.

¶63. As to the request for a firearms ballistics expert, we find that there has never been an issue about whether the pistol found behind Brandon Shaw's house was the murder weapon. The State's firearms expert matched the projectile found in Pernell's chest wall to the Lorcin .380 caliber pistol. Howell's argument at trial and now is that Ray or Lipsey shot Pernell and then left the gun behind Shaw's house. Howell does present the affidavit of a purported firearms expert who examined the pistol, the bullet, and the shell casing. Howell's expert opines that the bullet "has the same rifling characteristics and some microscopic similarities" as the pistol, but that the bullet lacks sufficient microscopic agreement to determine whether the bullet definitively came from that particular pistol. Likewise, Howell's expert states that

29

the cartridge case has a similar firing-pin impression as the pistol but insufficient details to make a positive identification. We find the inconclusive firearms testimony to be insufficient to require a post-conviction hearing on this issue.

### XIII. WHETHER HOWELL IS INNOCENT.

¶64.    Here, Howell states that "[n]o physical evidence linked him to the murder of Mr. Pernell. The State had no fingerprints, no DNA, no fibers, no ballistics, no confession, no property in his possession that was linked to the victim, or any other conclusive, objective evidence that linked Marlon Howell to the murder of David Pernell." Howell also argues that many of the witnesses against Howell have recanted and that Rice has been discredited.

¶65.    Howell also points to the affidavit of Terkecia Pannell, who alleges that Ray and Lipsey claimed responsibility for the killing. Howell claims that the cumulative result of all of his arguments set out above is that he is entitled to a reversal of his conviction, or at a minimum, an evidentiary hearing in the trial court. We disagree. Howell's guilt has been affixed by a jury and affirmed by this Court. Two eyewitnesses testified that Howell was the shooter. The murder weapon was found where Howell previously had been. A statement that "Howell shot a man" was deemed an adoptive admission of guilt and was heard by the jury. Howell needed money to pay his probation officer. He made a statement about robbing another man prior to this shooting. Even after reviewing the recantations and the new affidavits, we find that the jury's verdict is supported by the evidence.

### XIV. WHETHER THE STATES'S CLOSING ARGUMENT WAS IMPROPER.

¶66.    Howell next claims that the district attorney improperly inflamed the jury by referring to him with the nickname "Chiefa" during closing argument.  Howell maintains that the district attorney's use of the nickname was meant to play on the jury's fears of gang violence. Howell now claims that his admitted nickname, "Chiefa," had no connection to leadership in gang activity but instead referred to his "non-violent nature as well as his tendency to smoke marijuana in the context of 'Chiefa smokes peace pipe.'" The district attorney referred to Howell as "Chiefa" several times in closing argument, and the defense attorney posed no objection.

¶67.    We find that the claim of improper closing argument is procedurally barred.  First, no contemporary objection was made.  Second, this issue could have been raised in the direct appeal.  Because it was capable of review in previous proceedings, it is barred here.  Miss. Code Ann. § 99-39- 21 (Rev. 2007).  Procedural bar notwithstanding, we find no error. There was no discussion of any gang connection at trial, and the record does not reveal that the nickname had any obvious gang connotation.  Howell admits that "Chiefa" was his nickname. We find that the prosecutor was within reasonable closing argument in referring to Howell by his admitted nickname.  As we find no objectionable error in the use of the nickname, we also find no attorney ineffectiveness on this claim.

## XV. WHETHER THE STATE LACKED PROBABLE CAUSE FOR THE ARREST.

¶68. The murder of Pernell occurred on May 15, 2000. At the time, Howell was on probation for a previous drug conviction. As a condition of his probation, Howell was required to make a monthly payment to his probation officer. In April 2000, after several months of missed payments, Howell's probation officer initiated the process of issuing an arrest warrant for Howell; however, the warrant was not executed. After the murder, New Albany police officers contacted the probation office to find out if there was an available photograph of Howell. At that time they discovered that there was an outstanding warrant for Howell's arrest. A probation officer signed the warrant, and Howell was arrested. After the arrest, Howell was subjected to the lineup and he also presented his unverifiable alibi of being in Corinth with an unknown woman. In his petition, Howell claims that the arrest was illegal and that the comments and the lineup which stemmed from it should have been suppressed. Howell likewise claims that law enforcement officers should have been aware that the trial judge had held a hearing on the morning of May 15 and granted Howell a continuance to pay the probation arrearage.

¶69. This matter was raised at the trial court level and was discussed in Howell's direct appeal. *Howell*, 860 So. 2d at 731. This Court found that the arrest was proper; therefore, this claim is procedurally barred. Miss. Code Ann. § 99-39-21 (Rev. 2007).

¶70. Howell's new wrinkle at this stage in the proceedings is that the State should have known that on the same day that the warrant was executed, the trial judge had extended the

32

time for making the past-due probation payments. The State fails to address this issue in its response.

¶71. We find that the evidence adduced as a result of the arrest was properly admitted. This Court has recognized a good-faith exception to the exclusionary rule in certain circumstances. *See **White v. State***, 842 So. 2d 565, 570 (Miss. 2003). Where the officers execute the warrant in good faith and reasonably rely on the warrant, the evidence is properly admitted. There is no indication that the officers who arrested or questioned Howell exhibited any bad faith in relying on the warrant. This issue is thus without merit.

### XVI. WHETHER COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT RELEVANT FACTS ABOUT THE ARREST.

¶72. Howell maintains that his attorneys at trial failed to properly investigate and present evidence about the probation-violation warrant. Although Howell's trial attorneys presented arguments that the arrest had been illegal and sought suppression of any evidence resulting therefrom, Howell now claims that the attorneys should have investigated the clerk's notes from the May 15 hearing. He also claims that the attorneys should have questioned witnesses who were in the courtroom during the hearing. Howell asserts that his attorneys should have sought evidence in support of arguments that Howell had received an extension of his obligation to pay his probation officer. In its response, the State claims only that the validity of the warrant was raised on appeal. The State does not address the merits of the ineffective-assistance-of-counsel claim. As we have found that the arrest was legal, we find no deficiency on the part of Howell's attorneys; therefore, this issue is without merit.

33

## XVII. WHETHER COUNSEL WERE INEFFECTIVE IN FAILING TO DOCUMENT AND PRESERVE THE CHANGE-OF-VENUE MOTION.

¶73. The murder occurred in Union County, and, prior to trial, Howell's attorneys argued that pretrial publicity prevented Howell from receiving a fair trial in Union County. In the motion to transfer venue, Howell's attorney referred to several newspaper articles and one television report about the murder. Howell submitted seven affidavits from citizens who stated that he could not receive a fair trial in Union County. The State called several witnesses at the hearing on the motion to transfer venue. The witnesses included the Union County chancery clerk, a former Union County circuit clerk, and two current Union County supervisors. All of the Union County officials testified that discussion of the Howell case had been minimal and that Howell could receive a fair trial in Union County. The motion to transfer venue was denied after the trial judge found that the State had overcome the presumption of partiality and that the defendant could receive a fair trial in Union County.

¶74. The merits of the change-of-venue motion were discussed in the direct appeal, where this Court found that the trial court had not abused its discretion in denying the motion to transfer venue. *Howell*, 860 So. 2d at 720. This Court further reviewed the jury venire's responses to the trial court's questions about publicity and the jurors' ability to fairly judge the evidence. The Court determined that pretrial publicity had not tainted the jury pool. *Id*.

¶75. Howell now claims that his attorney failed to adequately investigate and present the motion to transfer venue. He offers the affidavit of a North Carolina attorney who states that the attorney was ineffective in failing to document other Union County cases where venue

34

was changed "which would have shown venue changes in far less public cases." The affiant produces no such Union County cases for us to review. The out-of-state attorney also claims that there was inadequate briefing of the motion to change venue. Howell provides no specific argument as to what should have been briefed or how any different argument would have yielded a better result. In its response, the State does not address the affidavits presented by Howell and poses no argument as to the merits of the ineffective-assistance-of-counsel claim.

¶76. We find that Howell's attorney filed a motion to change venue and supported that motion with numerous affidavits and all known relevant press documentation. The trial court held a hearing and determined that a fair trial could be held in Union County, and this Court found no error on appeal. The attorney adequately briefed and argued the motion. The mere fact that the motion to transfer venue was not granted does not lead to a finding of ineffective assistance of counsel. We find that this issue is without merit.

XVIII.    WHETHER COUNSEL WERE INEFFECTIVE IN FAILING TO DEVELOP AND PRESENT EVIDENCE IN MITIGATION DURING THE PENALTY PHASE OF TRIAL.

¶77. After Howell was convicted of capital murder, the trial moved to the penalty phase, at which time the State sought the death penalty. In mitigation, the defense provided testimony from several witnesses. Tommy Shoemaker testified that he was a manager at Wal-Mart, that he had been Howell's supervisor for six to eight months, and that Howell had been a satisfactory employee. Elaine Simonson, a long-time family friend who had known Howell all of his life, testified that Howell was a respectable, likeable, and kind person who

35

was not prone to violence. Howell's sister, Apresha Prather, testified that Howell was a loving person who was only twenty years old at the time of the crime. Likewise, it appears from the record that Howell's mother had been prepared to testify in the mitigation phase but was unable to testify due to being upset by the verdict in the guilt phase.

¶78. Howell now argues that the trial attorneys were ineffective in several respects. He claims that the attorneys should have investigated Howell's school records. After review, we find those records to be unremarkable insofar as providing any benefit concerning mitigation in the penalty phase of the trial.

¶79. Howell also claims that the trial attorneys should have called Brandon Shaw and Howell's two co-defendants, Ray and Lipsey, to testify. Shaw, Ray, and Lipsey have provided affidavits in which they claim that Howell was not a violent person. Lipsey testified at trial that Howell killed Pernell. Shaw testified that Howell discussed robbing a man prior to the eventual killing. Their current affidavit testimony would have been unbelievable on the heels of trial testimony to the contrary. Ray and Lipsey had pleaded guilty to manslaughter in Pernell's killing. The value of their testimony for Howell in the mitigation phase would have been negligible in light of their trial testimony during the guilt phase. Howell also claims that counsel should have called witnesses in mitigation who would have testified that the true meaning of Howell's "Chiefa" nickname had no gang connotations but referred to Howell's propensity to smoke marijuana like an Indian chief smokes a peace pipe. The attorneys would have been understandably reluctant to bring the jury's attention to additional law-breaking by Howell. Also, Howell relies in part on the

36

affidavit of Duncan Lott, who states that his failure to interview witnesses and consult with experts amounted to ineffective assistance of counsel. After a full review of the mitigation evidence presented during the penalty phase and the affidavits offered in the post-conviction proceedings, we disagree. Howell has offered no substantial mitigation evidence which his attorneys failed to present; therefore, we find Howell's claim of ineffective assistance of counsel in developing and presenting mitigation evidence to be without merit.

## XIX. WHETHER THE CUMULATIVE EFFECT OF COUNSEL'S PERFORMANCE AT THE TRIAL AND APPELLATE LEVELS WAS INEFFECTIVE.

¶80. In considering these two issues together, we are mindful of what we stated in *Byrom v. State*, 863 So. 2d 836 (Miss. 2003):

> [U]pon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect. That having been said, for the reasons herein stated, we find that errors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive Michelle Byrom of a fundamentally fair and impartial trial.

*Id.* at 847.

¶81. Applying the *Byrom* criteria, we find no indications of ineffective assistance of counsel outside the Court's specific findings of possible ineffective assistance of counsel, and we thus find no cumulative error.

## XX. WHETHER HOWELL WAS PREJUDICED BY THE PRE-TRIAL LINEUP PROCEDURES AND WHETHER HOWELL'S

37

## COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT TRIAL CONCERNING EVIDENCE RELATING TO THE LINEUP.

¶82. On the day after the crime, Howell was placed in a police lineup in which Charles Rice identified him as the shooter. In a subsequent hearing on Howell's motion to suppress the lineup evidence, the New Albany Chief of Police testified that he believed that Howell had been represented at the lineup by attorney Regan Russell. It appears from the record that the trial judge found that Howell had been represented by Russell. In the direct appeal, this Court found that the lineup was not overly suggestive and that the trial judge did not err in allowing the lineup testimony. Howell now claims that the State misrepresented his representation by counsel at the lineup, and that, in fact, he had had no attorney at the lineup. In the petition, Howell presents the affidavit of Regan Russell, who states that he was not present at the lineup and did not represent Howell at that point in time.

¶83. In its response, the State claims that the police chief misstated who represented Howell. The Chief has now sworn by affidavit that public defender Tom McDonough actually was present and represented Howell at the lineup. The State argues that Howell's representation at the lineup stage was discoverable prior to trial and is barred in the post-conviction proceedings. The State also argues that Howell was represented at the hearing, and whether the attorney was Russell or McDonough is immaterial.

¶84. In his reply to the State's response, Howell submits an affidavit from Tom McDonough, who swears that he never represented Howell in this case and was not present at the lineup. Howell's trial attorney did file a motion to suppress the lineup in which he

38

alleged that Howell was not represented at the lineup. Howell's attorney apparently made no effort to confirm whether Russell had been present at the lineup or not. He presented no evidence in support of his argument that Howell had not been not represented at that critical stage. Howell now claims that his previous attorney was ineffective in failing to investigate whether Howell had an attorney present at the lineup.

¶85. The State argues in part that whether Howell had an attorney at the lineup is not decisive. The State cites **Lattimore v. State**, 958 So. 2d 192, 198 (Miss. 2007), in which this Court found that procedural problems in the lineup were not sufficiently prejudicial in light of the witness's clear identification at trial.

¶86. In light of the affidavits from Russell and McDonough, we are unable to find that Howell's attorney was not ineffective in his representation through the suppression hearing. Rice's identification of Howell was obviously crucial to the State's case. Minimal efforts on the part of trial counsel could have confirmed Russell's presence or non-presence at the lineup. We thus find these issues to have merit, and an evidentiary hearing is required on these combined issues of whether Howell's attorney was ineffective at the lineup stage.

## XXI. WHETHER THE STATE FAILED TO DISCLOSE INFORMATION ABOUT TERKECIA PANNELL.

¶87. Terkecia Pannell was Brandon Shaw's girlfriend at the time of the murder. On the night of the crime, she was with Shaw at Shaw's house when Howell, Ray, and Lipsey returned after the murder. She was questioned by police and gave a statement in which she claimed that Shaw had given Howell a ride home and that Shaw had said that Howell had

told him that he had killed a white man on the north side of town. She was subpoenaed to testify at trial but was not called. Pannell has now submitted an affidavit in which she claims that she told prosecutors that she heard Ray and Lipsey say that they had shot a white man. She claims that she heard Ray and Lipsey discuss hiding the gun behind the house. She now claims that the prosecutors attempted to get her to testify that she saw Howell with the gun or heard Howell say that he shot the victim. She states that she insisted on telling the truth and that, as a result, the State never called her to testify. She claims that law enforcement officials pressured her into signing the initial statement, but she provides no specifics of that alleged coercion. She also claims that she never read the statement she gave to law enforcement during the initial investigation. However, that claim of never having read the statement is belied by the evidence that she made changes in the middle of her statement and initialed those changes.

¶88. Howell claims that Pannell's subsequent statements to prosecutors were exculpatory and were not disclosed to the defense in violation of ***Brady*** and the discovery rules. The State simply maintains that Pannell's present testimony is not credible. We find that this issue likewise has merit and thus must be resolved by way of an evidentiary hearing to determine the validity of Pannell's present claims.

### XXII. WHETHER COUNSEL WERE INEFFECTIVE IN RELATION TO TERKECIA PANNELL'S STATEMENT.

¶89. Alternatively, Howell claims that his attorneys were ineffective in failing to investigate Pannell's claims and to call her to testify at trial. Pannell was known to the

40

defense. She was listed as a State's witness and was subpoenaed to testify. Her statement to law enforcement had been provided to the defense in discovery. Yet it appears from the record that she was never questioned by the defense. Since we have found that Howell was entitled to an evidentiary hearing on Issue XXI concerning Terkecia Pannell, we find that Howell likewise is entitled to an evidentiary hearing on whether his attorneys were ineffective in failing to investigate Pannell's statement and possible testimony.

## CONCLUSION

¶90. The petition for post-conviction relief should be denied in part and granted in part. Howell is entitled to an evidentiary hearing on the claims of Rice's recanted testimony, the issues related to his representation or lack thereof at the lineup, and on issues related to Terkecia Pannell's alleged exculpatory statements. As to the remaining issues, Howell's petition for post-conviction relief is denied.

¶91. **APPLICATION FOR POST-CONVICTION RELIEF IS DENIED IN PART AND GRANTED IN PART.**

**SMITH, C.J., WALLER, P.J., RANDOLPH AND LAMAR, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES AND DICKINSON, JJ.**

**DIAZ, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶92. I concur with the majority opinion, but find that Howell is also entitled to relief on the suppression of Lipsey's initial statement and Lipsey's recantation.

41

¶93. Regarding Lipsey's initial statement, the majority finds the issue without merit because "[t]he only change between the first statement and the second statement related to Lipsey's own culpability." However, the majority is mistaken, as Lipsey's current affidavit clearly states that none of the defendants were involved: "*We* did not shoot Mr. Pernell. This included Marlon and was the truth."

¶94. This erroneous conclusion also supports the majority's finding that the issue is procedurally barred because it was "discussed fully at trial." While Lipsey did offer testimony at trial as to the contents of his first statement, it is directly contradicted by his current affidavit. Therefore, this issue could not have been discussed at trial, and the matter is not procedurally barred.

¶95. I also find that Howell has sufficiently demonstrated evidence of a ***Brady*** violation which entitles him to post-conviction relief. As the majority explains, in order to establish a ***Brady*** violation, the defendant must show: "(1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." ***Howard***, 945 So. 2d 326, 337 (Miss. 2006) (internal citation and quotations omitted).

¶96. Moreover, when the "reliability of a given witness may well be determinative of guilt or innocence," impeachment evidence affecting the credibility of that witness should not be

42

concealed by the prosecution. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). The duty to provide *Brady* evidence extends even to evidence that is "known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 869-870, 126 S. Ct. 2188, 165 L. Ed. 269 (2006) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438, 1155 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.

¶97. Lipsey claims that "[m]y first statement which I signed angered the officers. They ripped it up without my permission and told me that I was going to get death or life if I did not cooperate." Importantly, the State *does not dispute* that the interrogating officers destroyed this first statement or that the prosecution did not know about this statement. Additionally, the State does not address whether the statement could have been used to impeach Lipsey, one of the State's key witnesses. Because the first statement was destroyed, the defense could not have learned the contents of this statement. Taking into consideration our heightened scrutiny of death penalty cases, Howell is entitled to an evidentiary hearing as to whether the State destroyed exculpatory impeachment evidence affecting the credibility of a material witness in violation of *Brady*.[3]

---

[3]I also note that Rule 9.04 of the Uniform Rules of circuit and County Court Practice required the State to disclose "names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of *any statement*, written recorded or otherwise preserved of each such witness and the substance of any oral statement made by any witness." (emphasis supplied).

¶98. The suppression of this initial statement also supports Howell's argument that he is entitled to an evidentiary hearing as to Lipsey's recantation. Lipsey was integral to the State's case, as he was one of two eyewitnesses to the crime. "[T]he validity of a recantation by the central witness to a crime cannot be summarily resolved. There *must* be a [post-conviction] hearing." **Hardiman v. State**, 789 So. 2d 814, 817 (Miss. Ct. App. 2001) (Southwick, J.) (emphasis supplied).

¶99. For these reasons, I concur in part and dissent in part.

**GRAVES AND DICKINSON, JJ., JOIN THIS OPINION.**