771 So.2d 973 (2000)
Andre TURNER, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-CA-01882-COA.
Court of Appeals of Mississippi.
September 19, 2000.
Rehearing Denied November 21, 2000.
*974 Chokwe Lumumba, Jackson, Attorney for Appellant.
Office of the Attorney General by Dewitt T. Allred, III, Attorney for Appellee.
BEFORE KING, P.J., BRIDGES, AND MOORE, JJ.
MOORE, J., for the Court:
¶ 1. Andre Turner was indicted on two counts of selling cocaine. He was tried separately on each count and adjudicated guilty. The Simpson County Circuit Court sentenced him to ten years in the custody and control of the Mississippi Department of Corrections. This Court affirmed Turner's conviction on appeal from the first trial. Turner moved for post-conviction relief after the confidential informant recanted his testimony in the two trials in a sworn affidavit. The Mississippi Supreme Court gave Turner leave to petition for post-conviction relief and ordered the Simpson County Circuit Court to hold an evidentiary hearing to determine the effect, if any, of the witness's recantation. After the evidentiary hearing, the trial judge denied post-conviction relief and thoroughly delineated his findings of fact leading to his decision to deny relief. Turner cites the following issue on appeal
WHETHER APPELLANT'S RIGHTS WERE VIOLATED BECAUSE THE JUDGMENT IN THE EVIDENTIARY HEARING WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.
Finding no error, we affirm.

FACTS
¶ 2. On two separate occasions, Andre Turner sold cocaine to Tony Edwards. Edwards was a confidential informant who was working with Officer Jeff Herrin, a Simpson County narcotics officer. On both occasions, Edwards wore a body wire, and Officer Herrin monitored the drug transaction from the audio monitoring equipment in his vehicle. Edwards testified at both trials that Turner was the person who sold him the drugs. Officer Herrin testified at both trials that Turner's voice was on the tapes of the transactions. On one of the tapes, a female called out the name "Andre," and a male voice responded. Turner was adjudicated guilty at both of his jury trials for sale of a controlled substance.
¶ 3. Approximately two and one-half years after Turner's convictions, Edwards went to the office of Chokwe Lumumba, Turner's present attorney, and signed an affidavit in which he recanted his trial testimony. In the affidavit, Edwards stated that the Simpson County Sheriff Lloyd Jones coerced him into testifying against Turner. Edwards specifically stated in his affidavit that Sheriff Jones wanted him to help set Turner up for selling drugs. Upon expressing his reluctance to cooperate in this capacity, Edwards claimed that Sheriff Jones threatened him with jail time based on incriminating information that Sheriff Jones supposedly had against Edwards. He further claimed that Sheriff Jones told him if he did not cooperate, Edwards would not live to see jail time. *975 Edwards stated that Sheriff Jones continued to threaten him and his family. Also in the affidavit, Edwards stated:
10. [S]ometime after October 19, 1993, my house was firebombed. I was then absolutely convinced that the sheriff intended to kill me and my family, if I did not testify against Andre' Turner.
11. As indicated above, I then testified against Andre' Turner at his trials. I did so, due to fear for the life and safety of my family and myself. As indicated above, Andre' has never sold me drugs.
Sheriff Jones was never able to respond to Edwards's serious allegations of wrongdoing because he died two and one-half years before Edwards signed the affidavit.
¶ 4. Turner applied to the supreme court for leave to file a post-conviction relief motion based upon Edwards's affidavit. The supreme court granted leave and instructed the trial court to grant an evidentiary hearing to determine whether the new evidence warranted new trials. The trial court complied and held an evidentiary hearing at which Edwards and other witnesses testified. Edwards testified that he gave false testimony at both of Turner's trials because Sheriff Jones coerced him into testifying by threatening him and his family. He insisted at the evidentiary hearing that he was telling the truth.
¶ 5. During Edwards's testimony it was revealed that the fire bombing of Edwards's home occurred after he testified in Turner's first trial. Thus, Edwards's testimony in the first trial could not have been the result of the fear generated by the fire bombing as alleged in his affidavit. Edwards explained that the portion of his affidavit in which he suggests Sheriff Jones had a part in the fire bombing was a "mistake." He admitted that he told the authorities that he believed Melvin McLain was the perpetrator of the fire bombing. Two witnesses, Officer Herrin and district attorney Rusty Fortenberry heard Sheriff Jones offer to pay for Edwards and his family to stay in a motel when Edwards's home burned. Neither of these witnesses observed any animosity between Turner and Sheriff Jones. Further, while preparing for Turner's trials, both Officer Herrin and Fortenberry spent time with Edwards, outside Sheriff Jones's presence, and Edwards never once suggested that Turner did not sell the drugs. Indeed, Edwards worked with Officer Herrin as a confidential informant on forty to fifty drug operations. Officer Herrin testified that Sheriff Jones told him that Edwards had approached him about working as a confidential informant. Sheriff Jones only mentioned this briefly to Officer Herrin and never brought it up again. Officer Herrin did not contact Edwards about his interest in assisting in drug transactions in an undercover capacity for several months. During this time, Sheriff Jones never mentioned Edwards's request to become a confidential informant.
¶ 6. In a rather bizarre turn of events, Melvin McLain, who had been twice convicted of selling crack cocaine, testified that Sheriff Jones had asked McLain to sell drugs for him. According to McLain, Sheriff Jones wanted to set Turner up because Turner was making good money, and the sheriff was not getting any of that money himself. McLain testified that when the amounts that he was paying Sheriff Jones approached $7,500, McLain "started running" and Sheriff Jones began harassing him. We surmise that this testimony was offered to corroborate Edwards's testimony that Sheriff Jones had a motive to set Turner up.
¶ 7. The trial court entered its opinion and order in which it denied Turner a new trial. The trial judge entered very specific findings of fact in which he stated that he was not satisfied that Edwards's recantation testimony was truthful. He based this finding on the information contained in the affidavit which implicated Sheriff Jones in the fire bombing incident. The trial court noted that Edwards testified that he knew this portion of the affidavit was mistaken when he signed it, but he signed anyway. The trial court stated that *976 this was "a mistake of such magnitude that most affiants would withhold their signature until corrections were made, or at least execute an amended affidavit prior to giving testimony in open court." The trial court also found it suspect that Edwards waited over two and one-half years after Sheriff Jones's death to recant his testimony. The trial court did not believe McLain's incredible, uncorroborated testimony.

LAW AND ANALYSIS

WAS THE TRIAL COURT'S JUDGMENT AGAINST THE GREAT WEIGHT OF THE EVIDENCE?
¶ 8. Tony Edwards is a self-confessed liar. The dilemma in this case is whether Edwards lied during Turner's trials or whether he lied in his affidavit and in the evidentiary hearing. The trial court had the unenviable task of making this determination. Our task is to determine whether the trial court's findings persist under the standard of review. The learned trial judge has lightened our burden by thoroughly stating the reasons for his factual findings and for clearly articulating the law upon which he relied in rendering his opinion.
¶ 9. Afficionados of television lawyer dramas may be under the impression that a new trial is automatically required when the sole eyewitness to a crime recants condemning testimony. Under Mississippi law, however, this is not so and for good reason.
To be persuaded by such considerations would be to place the control of the courts in the hands of corrupt witnesses who could by successive repudiations of their testimony cause the issue to oscillate at will, and make of perjury a basis for relief at the hands of the law which they had defied. To argue that the defendant should be protected against a conviction upon perjured testimony is to assume, as we may not do, that the evidence adduced on the trial was perjured. To say that appellant is entitled to trial by due process of law finds echo in the right of the law itself to maintain a due and orderly process.
Bradley v. State, 214 So.2d 815, 817 (Miss. 1968) (quoting Dolan v. State, 195 Miss. 154, 13 So.2d 925, 927 (1943)). Keeping this in mind, we turn to a discussion of the circumstances which must be present before granting a new trial based upon witness recantation.
¶ 10. "Experience teaches all courts a healthy skepticism toward recanted testimony." Yarborough v. State, 514 So.2d 1215, 1220 (Miss.1987). The fact that a witness changes his testimony is not in and of itself an adequate ground for granting of a new trial. Peeples v. State, 218 So.2d 436, 438 (Miss.1969). "Our skepticism does not translate into callousness, however." Yarborough, 514 So.2d at 1220. Thus, an evidentiary hearing based upon the claim of recanted testimony was correct. Id.
¶ 11. If the trial court's confidence in the correctness of the outcome of the trial is undermined, then the trial court should grant a new trial. Id. However, if the trial court is not fully satisfied with the truthfulness of the recanting testimony the court should deny a new trial. Peeples, 218 So.2d at 439. "The determination should be left to the sound discretion of the trial court and should not be set aside unless clearly erroneous." Id. "In the end we are reviewing a finding of ultimate fact, one made by a trial court sitting without a jury. We do not reverse such findings where they are supported by substantial credible evidence." Yarborough, 514 So.2d at 1220.
¶ 12. That said, we review the findings of the trial court. The trial court was especially skeptical that Edwards did not recant his testimony until two and one-half years after Sheriff Jones died. The trial court found especially incredible Edwards's characterization of paragraph ten of his affidavit as "mistaken." That "mistaken" *977 portion of the affidavit blames the now deceased sheriff for the fire bombing of Edwards's home and was Edwards's explanation of why he gave false testimony in Turner's trials. Of course, the fire bombing occurred after Edwards testified in the first trial so it could not have been the motivation for Edwards's testimony. We, like the trial court, find that a mistake of this magnitude would have caused most people to insist upon clarification before signing an affidavit under oath or at least to insist on an amended affidavit before giving sworn testimony in a court of law. "[I]t is the right and duty of the [trial] court to deny a new trial where it is not satisfied that such [recantation] testimony is true. Especially is this true where the recantation involves a confession of perjury." Bradley, 214 So.2d at 817 (quoting 24 C.J.S. Criminal Law § 1454(k) (1961)). We find the trial court's refusal to accept Edwards's affidavit and recantation testimony as truthful was based upon substantial evidence and was not clearly erroneous or an abuse of discretion. Thus, we affirm the trial court's denial of a new trial.
¶ 13. THE JUDGMENT OF THE SIMPSON COUNTY CIRCUIT COURT DENYING POST-CONVICTION RELIEF IS HEREBY AFFIRMED. COSTS ARE ASSESSED TO APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.