# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00034-COA

TASHA MERCEDEZ SHELBY A/K/A TASHA SHELBY          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/10/2018 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | VALENA ELIZABETH BEETY<br>GREG POLINS<br>DOUGLAS LAMONT TYNES JR.<br>DANIEL P. GROSS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL<br>BY: ALICIA MARIE AINSWORTH<br>    ABBIE EASON KOONCE<br>    ASHLEY SULSER |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 08/04/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., GREENLEE AND LAWRENCE, JJ.**

**J. WILSON, P.J., FOR THE COURT:**

¶1. In 1997, two-year-old Bryan Thompson IV (Bryan) died as a result of multiple blunt force injuries to his head that caused significant bleeding around his brain and massive swelling of his brain. Tasha Shelby, who was then engaged to Bryan's father, claimed that she was awakened by a "big thump" around 3:30 or 4 a.m. and found Bryan lying on the floor of his bedroom. Shelby was the only adult in the home at the time. Shelby was indicted

for capital murder. She was convicted and sentenced to life imprisonment without parole following a jury trial, and this Court affirmed her conviction and sentence on appeal.

¶2.     In 2015, Shelby filed a motion for post-conviction relief based on "newly discovered evidence" consisting of the changed opinion of the pathologist who performed the autopsy and testified at her trial and post-trial developments in the scientific literature related to "shaken baby syndrome." Following an evidentiary hearing, the trial court found that Shelby failed to meet her burden of proving that the new evidence probably would produce a different result in a new trial. We cannot say that the trial court's finding is clearly erroneous. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

### I.     Bryan's Death

¶3.     In May 1997, Shelby and her then-fiancé Bryan Thompson III (Thompson) were living together in Biloxi with their newborn baby, Devon; Shelby's three-year-old son, Dakota; and Thompson's two-and-a-half-year-old son, Bryan. Around 7:30 p.m. on May 29, Thompson left to go to work. Shelby's grandmother Honey Schalk and Schalk's husband, Don, came to Shelby's house around 8 p.m. to pick up Dakota for an overnight visit at their house. The Schalks stayed for about an hour. Honey testified that Bryan played happily throughout their visit and that she did not notice any marks or bruises on him. According to Shelby, she gave Bryan a snack and put him to bed after the Schalks left.

¶4.     Shelby told law enforcement that she was awakened by a "big thump" around 3:30 or

2

4 a.m. According to Shelby, she found Bryan on the floor of his bedroom, and he appeared to be having a seizure and was not breathing. Shelby called Thompson at work and told him Bryan was not breathing and that she could not get through to a 911 operator. Thompson returned home to find Shelby standing in the doorway holding Bryan. Thompson testified that Bryan appeared "pretty much lifeless and limp and blue as could be."

¶5. Thompson laid his son on the floor and attempted to administer CPR. He then decided to take Bryan to the hospital. However, when he asked Shelby whether they "should call the hospital or 911, . . . she said no." Thompson told Shelby to get Devon so they could take Bryan to the hospital. Thompson testified that he "bumped [Bryan's] head slightly on the door" of the van as he put the child in the van. Thompson told Shelby to continue to try administer CPR to Bryan on the way to the hospital. On the way to the hospital, a deputy sheriff stopped Thompson for speeding. Thompson explained to the deputy that Bryan was not breathing, and the deputy got into the van and administered CPR as Thompson continued to the hospital.

¶6. When they arrived at Biloxi Regional Medical Center, Bryan was rushed to the emergency room. Dr. Max Odom performed mouth-to-mouth resuscitation on Bryan, placed a bag valve mask over his mouth, inserted a breathing tube into his trachea, administered adrenaline, and eventually "establish[ed] a palpable pulse and blood pressure." Odom testified that it was "apparent to [him], without any confirmatory tests, that [Bryan] had significant brain injury from blunt trauma." A head CT scan "[s]howed diffuse subarachnoid

3

hemorrhage throughout the subarachnoid space" in Bryan's skull and a "small subdural hematoma on the right side" of Bryan's head. Bryan was transported to the University of South Alabama Medical Center in Mobile for further treatment, but he was pronounced dead the next day, May 31, 1997. Dr. Leroy Riddick performed the autopsy and concluded that the cause of death was "blunt force trauma to the head." The manner of death was ruled a homicide.

## II. Shelby's Trial, Conviction, and Appeal

¶7. Shelby was indicted for capital felony murder for killing Bryan during the commission of felony child abuse. Her case proceeded to trial in 2000.

¶8. Dr. Odom testified that Bryan had multiple bruises in various stages of healing on his head and under his armpits when he arrived at the emergency room. Some of the bruises were three to five days old, while others reflected injuries within twenty-four hours. Dr. Odom also testified that the diffuse hemorrhaging in the subarachnoid space within Bryan's skull was caused by ruptures to veins and arteries in that space. These injuries caused pressure on Bryan's brain and deprived his brain of oxygen. Dr. Odom testified that subarachnoid bleeding caused by an aneurysm would be focused in one place. However, Bryan's CT scan showed "generalized subarachnoid" hemorrhaging "throughout" the subarachnoid space, which "suggest[ed] multiple sights of bleeding or torn bridging veins in the subarachnoid space." Dr. Odom did not believe that Bryan's injuries could have been caused by a fall from Bryan's bed, which measured only sixteen inches from the top of the

4

mattress to the floor.

¶9. Thompson testified that he noticed "a red dot close to [Bryan's] cornea" about two weeks prior to his death and that Bryan's eyes appeared "bloodshot" for three to four weeks before his death. Thompson asked Bryan's pediatrician about the issue, and he recommended that Bryan see a neurologist. According to Thompson, Bryan had an appointment with a neurologist scheduled for about a week after his death. "[O]n occasion," Thompson had also noticed that Bryan would "look up" and close his eyes.

¶10. Thompson stated that when he left for work on May 29, 1997, Bryan did not have any of the bruises—either on his head or under his arms—that were clearly visible in the photographs taken at the hospital. Thompson also testified that none of those injuries could have occurred when he slightly bumped Bryan's head on the van's door as they left for the hospital. Thompson testified that he had nothing to do with his son's death.

¶11. Honey Schalk testified that Bryan was happy, giggling, and playing while she visited with him on May 29, 1997. Honey stated that not long before Bryan's death, Shelby had complained that "she felt like she was dealing with a retarded child because [Bryan] was very slow" and "still wasn't potty trained." Honey testified that on one occasion about three to four weeks prior to Bryan's death, she noticed that the bottom portion of the whites of his eyes were "blood red."

¶12. Sergeant Warren Newman of the Biloxi Police Department interviewed Shelby soon after she arrived at Biloxi Regional Medical Center. Newman testified that Shelby "didn't

5

seem very concerned" and was not "that upset" or crying. Shelby told Newman that she was awakened by "a thump" and found Bryan lying unresponsive on the floor in his bedroom. Newman testified that Bryan's bedroom had "shag carpet" and a "padded floor" and that the top of Bryan's mattress was only sixteen inches from the floor.

¶13. Dr. Leroy Riddick, an expert forensic pathologist, testified that Bryan "died from blunt force injuries to his head." Dr. Riddick testified that Bryan had a quarter-inch bruise on his left forehead, a three-eighths-inch bruise on the outer right side of his face, and a one-eighth-inch bruise on the outer part of his eyebrow. All of these bruises were less than two days old. Bryan also had a 1.25-inch bruise on his right cheek, a quarter-inch bruise on the back of his left shoulder blade, a bruise in the midline of his lower back, and another bruise on the outer part of his left thigh. Dr. Riddick determined these bruises were recent and had occurred "within the time frame of May the 30th."

¶14. Dr. Riddick found that Bryan experienced significant subdural hemorrhaging and diffuse subarachnoid hemorrhaging and that "his brain was massively swollen." These injuries indicated that Bryan suffered "what is known as diffuse axonal damage." Dr. Riddick testified that if "you intentionally shake a baby really hard and bang its head," you will tear the tiny axons (projections of nerve cells), which is "known as diffuse axonal damage." According to Dr. Riddick, that was "the injury that killed [Bryan]." Dr. Riddick further testified that the bruises on the back and front of Bryan's head "indicate[d] that his head impacted something with enough force to tear the veins inside the arachnoid space and

6

also to tear . . . a large number of the [axons] in his brain." Dr. Riddick opined that a fall from sixteen inches to a carpeted floor could not have caused all the contusions on Bryan's head or the internal brain injuries that he suffered. Dr. Riddick further testified that Bryan's extensive brain injuries could not have been the result of an accident. Finally, Dr. Riddick opined that the shaking and impact that caused Bryan's injuries occurred no more than two to three hours before he arrived at the hospital.

¶15. On cross-examination, Dr. Riddick reiterated that the cause of Bryan's brain injuries and death was "multiple blunt force injuries" to Bryan's head. Defense counsel asked, "[T]hat's kind of a medical term for . . . shaken baby syndrome; is that correct?" Dr. Riddick answered, "No, it is not the same. Blunt force injuries are bruises, abrasions, scrapes, hematomas, or tears, or lacerations, and fractures. Those are blunt force injuries. . . . I think there probably was shaking . . . , but it was shaking and impact." That is, Bryan's head was forcefully "banged" against something, causing blunt force injuries.

¶16. Dr. Riddick also was cross-examined about scientific articles that concluded that children could suffer fatal head injuries from even short falls or minor impacts. Dr. Riddick stated that he was aware of such literature and that some doctors held that opinion, but he said that in his "own experience" he had never seen a fatal injury caused by a short fall. He also questioned some of the articles' reliance on "unwitnessed events." Dr. Riddick testified on redirect examination that "[t]heoretically" a short fall could generate enough force to cause a fatal head injury. However, the practical experience of most doctors is that children

"do not sustain lethal injuries from short falls." Dr. Riddick stated, "It may happen. It is an extraordinary rarity if it does." Finally, on re-cross-examination, Dr. Riddick again stated that he was "not saying" that a short fall could not cause a fatal head injury.

¶17. After the State rested, Shelby recalled Thompson. Thompson was asked if he was alone with Bryan for two to three hours just before he went to work on May 29, 1997. Thompson testified that he could not recall and therefore could not deny it.

¶18. Dr. Anthony Ioppolo, a board certified neurosurgeon, testified for the defense that he believed that the most likely cause of death was "herniation of the brain"—i.e., swelling of the brain caused by "a combination of a subarachnoid hemorrhage . . . and seizure activity" caused by a subarachnoid hemorrhage. Dr. Ioppolo explained that "[s]eizures can cause greatly increased blood flow into the brain." Dr. Ioppolo believed that Bryan had a seizure, which "tip[ped] the scales" and caused the herniation or severe swelling. Dr. Ioppolo thought it was likely that Bryan died from "shaken baby syndrome." But he also believed that reports of Bryan's eyes "rolling back" in his head and blood in Bryan's eyes in the weeks prior to his death indicated that Bryan had been shaken violently on prior occasions, which caused bleeding around his brain and seizures. Dr. Ioppolo believed that Bryan's condition gradually worsened over a period of time until he had a seizure in the early morning hours of May 30, 1997, which "was the final event that the brain couldn't compensate for any longer that caused the herniation and [Bryan's] death." In Dr. Ioppolo's opinion, Bryan did not necessarily suffer any external injury immediately before his death and could have been

8

conscious and ambulatory for twelve hours or "a lot longer" after he was last abused.

¶19. Dr. Ioppolo also testified that the relevant medical literature described "a number of cases" in which children suffered fatal injuries as a result of short falls. He stated such deaths were not common, "but it does happen." Thus, while such a fall was a possible cause of Bryan's death, it was "the less likely cause."

¶20. The jury found Shelby guilty of capital felony murder. In the sentencing phase of the trial, the jury found that Shelby should be sentenced to life imprisonment without parole, and the trial court imposed that sentence. The trial court also denied Shelby's motion for judgment notwithstanding the verdict or a new trial. This Court affirmed Shelby's conviction and sentence, holding that there was sufficient evidence to support the conviction and that the jury's verdict was not against the overwhelming weight of the evidence. *Shelby v. State*, 812 So. 2d 1144 (Miss. Ct. App. 2002).

### III.    Post-Conviction Proceedings

¶21. In 2005, Shelby filed her first application for leave to file a motion for post-conviction relief (PCR) in the trial court, alleging ineffective assistance of counsel at trial. A panel of the Mississippi Supreme Court denied her application. *Shelby v. State*, No. 2005-M-00615 (Miss. Apr. 28, 2005).

¶22. In 2015, Shelby filed a second application for leave to file a PCR motion, alleging that her conviction should be set aside based on new scientific evidence related to "shaken baby syndrome." Shelby's application relied on affidavits from new expert witnesses, and she

9

later submitted an affidavit from Dr. Riddick. Dr. Riddick stated that he had only recently "learned" that Bryan "had a seizure disorder and was having multiple seizures in the days before his death." Dr. Riddick stated it was "likely that [his original] conclusions might have been different" if he had been aware of that information at the time of Shelby's trial. A panel of the Mississippi Supreme Court granted Shelby leave to file a PCR motion in the trial court. *Shelby v. State*, No. 2015-M-01145 (Miss. Aug. 8, 2016). Shelby filed her motion in the trial court, and the court held a three-day evidentiary hearing on the motion in 2018.

¶23. At the hearing, one of Shelby's trial attorneys, Michael Cox, testified that because Shelby's own expert, Dr. Ioppolo, thought that Bryan's injuries were caused at least in part by violent shaking, their primary "trial strategy was to try to enlarge the time period in which [Bryan] could have . . . received . . . injuries from shaking." In other words, they wanted to present evidence that it was possible that Bryan received his injuries when he was in the care of someone other than Shelby.

¶24. Dr. Kenneth Monson testified for Shelby as an expert in the field of biomechanical engineering. Dr. Monson testified that "literature shows . . . that children are very seldom injured seriously from a household fall, but there are some cases that have been well documented where a child has, in fact, even died from a household fall." Dr. Monson opined that if Bryan could have suffered a fatal brain injury if he were "standing on his bed and he somehow fell off his bed to the floor in a way where he was unable to protect his head" so that his head "absorb[ed] the full energy of that fall." Dr. Monson wanted "to be clear" that

10

he was "specifically talking about a fall from a standing height." His opinion assumed that Bryan did not brace himself with an arm or any other part of his body but rather fell from a full standing position directly onto his head. Dr. Monson testified that if a child simply rolled off a low bed onto the floor, he "would not expect that fall" to generate enough force to cause fatal injuries. Dr. Monson also "want[ed] to be clear" that "certainly [a] fall from a bed [would not] create bruises in multiple locations on the head." Thus, if Bryan had such bruises—which Dr. Monson understood was "disputed"—then some of his bruises "would just have to have other explanations."

¶25.   Dr. Monson stated that since Shelby's trial in 2000, there had not "been a change, per se," "in the generally accepted scientific position" as to whether short falls can cause fatal injuries in children. Dr. Monson testified that "in the biomechanical community" there had "historically been an appreciation that a relatively short fall has the potential to create high accelerations," so there had not been "a significant change" in that respect. However, since 2000 there have "been additional contributions [to the literature] that shed greater light on the potential severity of the short fall." Dr. Monson relied on a number of articles. When he was asked whether "most" of those articles were published after 2000, he stated, "Certainly many of them. I don't know about most."

¶26.   Dr. Monson also opined that a person could not inflict fatal injuries on a child Bryan's size through "shaking" alone. However, he agreed that Bryan's fatal blunt force injuries could have been inflicted by slamming Bryan's head against a hard object.

11

¶27. Dr. Julie Mack testified for Shelby as an expert in diagnostic radiology. Dr. Mack opined that the bleeding observed on Bryan's CT scan was the result of bleeding in smaller veins within the dura, not torn bridging veins in the subarachnoid space, as Dr. Riddick had testified at trial. Dr. Mack testified that in 2000, doctors believed that a subdural hemorrhage could only be caused by ruptured bridging veins, which in turn indicated severe trauma. According to Dr. Mack, several post-2000 articles, including some she had authored, show that a slow bleed in the dura can result in subdural hemorrhaging and that bleeding in the dura can be caused by a short fall rather than by severe trauma.

¶28. Dr. Riddick, who had retired in 2000, testified that he changed his opinion about Shelby's case in 2015 after the Innocence Project sent him some materials. He testified that the Innocence Project provided "information about a long family history of seizure disorder[s],"[1] which he now believes is "an adequate explanation for the swelling of the brain which ultimately is what caused [Bryan's] death." Dr. Riddick's current opinion is that a seizure and a short fall are a "better explanation" for Bryan's death than "some form of intentional abuse." Dr. Riddick stated that he now feels that "this case was, in a way, [the]

---

[1] Dr. Riddick cited a social worker's handwritten notes in Bryan's records from the University of South Alabama Medical Center (USAMC). According to the notes, Bryan's paternal grandmother told the social worker that "others in [their] family" had a "history of seizure disorders," and the grandmother "wonder[ed]" "in retrospect" whether Bryan had been having seizures recently when he had been "staring into space." Dr. Riddick testified at Shelby's trial that he had reviewed Bryan's USAMC records, but he did not mention the social worker's notes in his trial testimony. At trial, Thompson testified that his mother did have seizures, but he believed they were caused by "work conditions." Thompson denied that there was any other family history of seizures.

12

once in a million" case in which a short fall could have been fatal.

¶29. Dr. Riddick's current opinion is that Bryan "died from massive cerebral edema secondary to seizure disorder with asthma and blunt force injuries as contributory, and the manner of death is accident." He now believes that Bryan suffered blunt force injuries when he "somehow fell off the bed." Dr. Riddick said he does not know whether Bryan "was standing up and fell backwards or whatever"; but he believes that Bryan hit the back of his head when he fell, "and that . . . could [have] cause[d] the bruise on the back of his scalp." According to Dr. Riddick, Thompson's trial testimony that he bumped Bryan's head on the van's door "would account for . . . some of the [other] injuries." Dr. Riddick stated that he had changed his opinion about the case because at the time of trial "there was no firm diagnosis of a seizure disorder." He also testified that at the time of trial, he did not believe a short fall could cause a fatal injury, but he now believes it is possible. At the PCR hearing, Dr. Riddick stated, "It's rare, but it does happen . . . . [I]t is uncommon, but it does occur."

¶30. On cross-examination, Dr. Riddick acknowledged that there was nothing in Bryan's medical records to indicate that any doctor had observed a seizure or diagnosed a seizure disorder. Dr. Riddick also acknowledged that Bryan's pediatrician's records did not reflect any complaints about seizures. Dr. Riddick agreed that when he testified at trial, he identified the cause of Bryan's death as "blunt force injuries," not "shaken baby syndrome." At trial, the latter term was first mentioned by defense counsel, at which point Dr. Riddick made clear that blunt force injuries and shaken baby syndrome are not the same. Dr. Riddick

13

still agrees with that part of his trial testimony.

¶31.    Dr. Riddick also admitted that he signed his affidavit in support of Shelby's PCR application without reviewing his own trial testimony or files.  In addition, in a December 2017 deposition, Dr. Riddick asserted that Bryan was in an auto "accident on the way to the hospital, which would account for the injuries on the front of his head as well as the injury to the back of the head."  Dr. Riddick further claimed that EMTs responded to the wreck and "extricated" Bryan from the vehicle.  In his deposition, Dr. Riddick opined that this alleged auto accident "was an alternative" explanation for some of Bryan's injuries.  However, at the PCR hearing, Dr. Riddick admitted that he "was wrong" about all of that—there was no auto accident en route to the hospital.  The trial court noted these issues with Dr. Riddick's testimony in the court's final order denying Shelby's PCR motion.

¶32.    Dr. Janice Ophoven testified for Shelby as an expert in forensic pathology.  She opined that Bryan died from diffuse brain damage caused by a lack of oxygen to his brain. She also felt that Bryan had an undiagnosed seizure disorder and that seizures contributed to his death.  She concluded that the manner of Bryan's death was "undetermined" because there is more than one "plausible" explanation for his death.  According to Dr. Ophoven, Bryan's death could have been caused by an accident, intentional abuse, or a "constellation of natural causes."[2]

---

[2] On cross-examination, Dr. Ophoven stated that Bryan's short fall from the bed to the floor may have been the cause of death, a contributing cause, or only "a consequence of . . . his fatal process."  She stated that intentional abuse was a "possible" cause of Bryan's

14

¶33.   Dr. Ophoven also testified that beginning around 2001 or 2002 there had been a "shift" in the scientific community's views regarding shaken baby syndrome. Dr. Ophoven stated, "[F]or the last ten years, it's been pretty well established [among forensic pathologists] that the mechanism of shaking is not sound, and unless there's evidence of blunt force trauma, it is not a reasonable or legitimate conclusion as to the mechanism of injury in a child who has no marks on their head or body."[3] Dr. Ophoven went on to describe several post-2000 studies and articles on shaken baby syndrome that she said reflected a shift in scientific opinion. She also gave testimony that essentially mirrored Dr. Mack's opinions regarding the source of the blood around Bryan's brain. Like Dr. Mack, she stated that Dr. Riddick's trial testimony was not supported by current scientific evidence, although it was consistent with prevailing views at the time of trial. Dr. Ophoven also testified that short falls can cause fatal injuries in children.

¶34.   On cross-examination, Dr. Ophoven conceded that even today "there is voluminous literature supporting either side of [the] debate" regarding the effects of violently shaking a child. She stated that even now "there is a wide difference of opinion" regarding shaken

death, "but there is insufficient evidence in this case to conclude that the only explanation is the child was the victim of violence."

[3] As was pointed out on cross-examination, this testimony did not fit the facts of this case. Here, there *is* clear evidence of blunt force trauma, and Bryan *did* have marks (bruises) on his head and body.

15

baby syndrome or abusive head trauma.[4] She acknowledged that numerous individuals had confessed to causing a child's death by violent shaking, but she said that an "elocution" in court "is not the same thing as scientific evidence verifying" that the event occurred. Dr. Ophoven also readily agreed that a blunt force injury (an impact) that occurs during shaking could cause serious brain injury and death in a child. She also agreed that it is extraordinarily rare for a child to die as a result of a short fall.

¶35. The State's only witness at the PCR hearing was Dr. Scott Benton, a professor of pediatric medicine at the University of Mississippi Medical Center. The circuit court accepted Dr. Benton as an expert in the fields of child abuse pediatrics and pediatric forensic medicine. Dr. Benton concluded that Bryan "died of blunt force trauma to the head with additional acceleration/deceleration involved in that trauma mechanism." Dr. Benton concluded that Bryan's injuries occurred sometime after 9 p.m. on May 29, 1997. He further concluded that "seizures did not play a role in the cause of death." He noted there is no medical evidence that Bryan had a seizure disorder, and, moreover, there is no medical literature that shows that a seizure disorder causes intra-cranial bleeding. Dr. Benton also concluded that death could not have been caused by a sixteen-inch fall to the floor—which, he noted, was consistent with the opinions of Shelby's experts, who posited that Bryan was standing up in bed before he fell or that other factors contributed.

---

[4] Dr. Ophoven asserted that today the "vast majority of pathologists" do not accept shaken baby syndrome as a valid diagnosis, although she acknowledged that a survey shows that the vast majority of practicing physicians accept the diagnosis.

¶36. Dr. Benton acknowledged that there had "been challenges to the concept" of shaken baby syndrome[5] and that there had "been some evolution [in the scientific community's] understanding of it." But he testified that there was a "general acceptance" of the diagnosis among physicians, emergency physicians, and neurosurgeons. Dr. Benton cited various studies and articles in support of his position. He further testified that there was general agreement that an impact causing a blunt force injury "certainly" could be fatal. He stated that there was "no controversy" on that point.

¶37. Dr. Benton testified that the conclusions of the original autopsy report and Dr. Riddick's testimony at Shelby's trial were still sound and correctly identified the cause and manner of death. He testified that the medical literature did not support Dr. Mack's theory that bleeding in the dura could account for Bryan's significant intra-cranial bleeding. He also testified that a short fall could not account for the multiple bruises in different locations on Bryan's head.

¶38. The circuit court subsequently denied Shelby's PCR motion. In a detailed, twenty-seven page order, the court found that Shelby was not entitled to relief because she failed to demonstrate that her new evidence "would probably produce a different result" in a new trial. Shelby filed a notice of appeal.

## ANALYSIS

---

[5] Dr. Benton testified that the "controversy" concerning the diagnosis and articles challenging it actually dated back to 1987. Dr. Riddick testified that the controversy regarding the diagnosis began in the 1970s.

17

¶39.　On issues of law, our standard of review is de novo. *Kidd v. State*, 221 So. 3d 1041, 1043 (¶8) (Miss. Ct. App. 2016), *cert. denied*, 220 So. 3d 977 (Miss. 2017). However, "the trial court sits as finder of fact in a [PCR] proceeding" in which "the evidence on a critical point is in conflict." *Henderson v. State*, 769 So. 2d 210, 213 (¶8) (Miss. Ct. App. 2000). In such a case, we will not reverse a trial court's finding of fact, including "a finding of ultimate fact," "unless it is clearly erroneous." *Merritt v. State*, 517 So. 2d 517, 520 (Miss. 1987). Moreover, "[w]hen conflicting evidence capable of more than one reasonable interpretation is presented to the court, the trial judge, as with any finder of fact, is entitled to determine the credibility of the witnesses and the weight to afford their testimony." *Dickerson v. State*, 291 So. 3d 344, 353 (¶36) (Miss. 2020).

¶40.　Under the Uniform Post-Conviction and Collateral Relief Act (UPCCRA), a PCR motion generally must be filed within three years after the prisoner's conviction is affirmed on appeal. Miss. Code Ann. § 99-39-5(2) (Rev. 2015). The UPCCRA also generally bars second or successive PCR motions. *Id.* § 99-39-23(6) (Rev. 2015). However, the statute of limitations and the successive-writ bar both make an exception for cases in which

> the petitioner can show the existence of . . . "evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be *practically conclusive* that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence."

*Kidd*, 221 So. 3d at 1044 (¶14) (quoting Miss. Code Ann. § 99-39-23(6)); *see also* Miss. Code Ann. § 99-39-5(2)(a)(i) (same). A movant seeking post-conviction relief under these provisions must show that

18

(1) the new evidence was discovered after the trial; (2) it could not by due diligence have been discovered prior to trial; (3) it is material to the issue and not merely cumulative or impeaching; and (4) it will probably produce a different result or verdict in the new trial.[6]

*Kidd*, 221 So. 3d at 1043 (¶9) (brackets omitted) (quoting *Van Norman v. State*, 114 So. 3d 799, 801 (¶11) (Miss. Ct. App. 2013)). "Relief must be denied if the movant fails to meet any one of these four elements." *Id.* (quoting *Van Norman*, 114 So. 3d at 801 (¶11)).

¶41.    As a threshold matter, the State argues that Shelby's new evidence does not qualify as "newly discovered evidence" under the UPCCRA. For example, as discussed above, Dr. Riddick's new opinions are based in large part on his new belief that Bryan had a seizure disorder. However, the defense argued at the trial in 2000 that seizures contributed to Bryan's death, and no new facts have been discovered on this issue. Then and now, there is no diagnosis or objective evidence of a seizure disorder but only a vague and disputed account of a "family history" and two lay witnesses who described behaviors that Shelby argues were seizures. Similarly, the State argues that Shelby's various experts did not present new evidence but only more recent studies and articles addressing the same issues that were raised during Shelby's trial.

---

[6] The "probably produce" standard seems somewhat less exacting than the statutes' actual language—i.e., "practically conclusive." However, the Supreme Court has used this language and four-part test when applying these statutory exceptions. *Brown v. State*, No. 2018-DR-01256-SCT, 2020 WL 2079088, at *16 (¶95) (Miss. Apr. 30, 2020). In addition, even before the UPCCRA was enacted, the Supreme Court seemed to equate "practically conclusive" with "probably produce" for purposes of newly-discovered-evidence claims. *Lang v. State*, 232 Miss. 616, 620-24, 100 So. 2d 138, 140-42 (1958).

¶42. Regardless of whether some or all of Shelby's evidence is "new," the trial court considered all of the evidence and found that it would not "probably produce a different result" in a new trial. The trial court's findings of fact on this issue are not clearly erroneous. Therefore, the judgment denying Shelby's PCR motion must be affirmed on that ground. *See Witherspoon v. State*, 767 So. 2d 1065, 1068 (¶15) (Miss. Ct. App. 2000) ("Since we have concluded that the trial judge did not abuse his discretion in finding that the newly discovered evidence would not likely have produced a different result had it been presented to the jury during the trial, it is not necessary for us to discuss the remaining prongs of the test for granting a new trial on the basis of newly discovered evidence.").

¶43. We first address Shelby's contention that she is entitled to a new trial based on Dr. Riddick's changed opinion. The trial court found that Dr. Riddick's change of mind would not probably produce a different result at trial, and we cannot say that the trial court clearly erred in this finding. To begin with, the mere fact that Dr. Riddick changed his opinion does not require a new trial. *Howell v. State*, 989 So. 2d 372, 384 (¶33) (Miss. 2008) ("The fact that a witness changes his testimony after the trial does not necessarily entitle the petitioner to a new trial.").[7] A witness, whether expert or lay, does not have the power to nullify a criminal conviction by simply recanting prior testimony. Indeed, "[a]s a general rule,

---

[7] *Cf. Turner v. State*, 771 So. 2d 973, 976 (¶9) (Miss. Ct. App. 2000) ("Afficionados of television lawyer dramas may be under the impression that a new trial is automatically required when the sole eyewitness to a crime recants condemning testimony. Under Mississippi law, however, this is not so and for good reason.").

recanted testimony is exceedingly unreliable, and is regarded with suspicion" and "skepticism." *Howell*, 989 So. 2d at 384 (¶33) (quotation marks omitted).

¶44. In addition, the trial court found that the reasons that Dr. Riddick gave for his changed opinions were not persuasive. As noted above, the primary reasons that Dr. Riddick gave for changing his mind were a supposed "long family history of seizure disorder[s]" and the fact that Bryan allegedly experienced "multiple seizures in the days before his death." However, there is little evidence to support *any* such family history, and what evidence does exist is the *same* disputed, inconclusive evidence that was readily available and used in Shelby's trial. Nor is there anything else to substantiate that Bryan suffered seizures in the days leading up to his death. In addition, the trial court noted other significant errors and inconsistencies in Dr. Riddick's opinions during the PCR proceedings. *See supra* ¶31. Put simply, the trial court did not clearly err by finding that the reasons for Dr. Riddick's changed opinions were unreliable and unpersuasive.

¶45. With respect to whether short falls can cause fatal injuries, the testimony at the PCR hearing was not materially different from the trial testimony. At trial, Dr. Riddick testified, "It may happen. It is an extraordinary rarity if it does."[8] At the PCR hearing eighteen years later, he similarly testified, "It's rare, but it does happen . . . . [I]t is uncommon, but it does occur." Dr. Monson and Dr. Ophoven also testified that it is extremely rare for a short fall

---

[8] In addition, Dr. Ioppolo testified that it was uncommon for a short fall to cause a fatal injury, "but it does happen."

21

to result in death. Indeed, Dr. Monson made clear that a simple fall from a low bed would not produce fatal injuries. Rather, he posited that if Bryan was standing up on his bed and somehow fell directly onto his head, then that could have caused fatal injuries. Thus, in substance, the testimony at the PCR hearing on this issue was similar to the testimony at trial. We cannot say that the trial court clearly erred by finding that the new-but-similar testimony would not probably produce a different verdict.

¶46.    The trial court also made findings to support its conclusion that Shelby's experts' criticisms of "shaken baby syndrome" (SBS) did not warrant a new trial. As the trial court noted, Dr. Riddick testified at trial that Bryan died as a result of blunt force injuries to his head caused by an actual impact with some object. At trial, Dr. Riddick was first asked about SBS on cross-examination, and he testified that blunt force trauma and SBS were "not the same." He testified that Bryan "probably" was shaken but that his blunt force injuries were inflicted when his head was "banged" against something. In addition, Bryan had multiple bruises in different locations on his head, which were caused by impacts, not shaking alone. Thus, this case does *not* involve a victim with no external injuries suggestive of abuse or an accusation of shaking based solely on internal injuries. No expert who testified at trial or at the PCR hearing disputed that forcefully banging a child's head against a hard object can cause serious brain injury and death.[9]

---

[9] For this and other reasons, the dissent's reliance on *Clark v. State*, No. 2017-KA-00411-COA, 2019 WL 5566234 (Miss. Ct. App. Oct. 29, 2019), *cert. granted*, 293 So. 3d 832 & 833 (Miss. 2020), is misplaced. In *Clark*, a direct appeal, we held that an expert's

¶47. In addition, the evidence at the PCR hearing indicated that a majority of practicing physicians continue to accept SBS or abusive head trauma (AHT) as valid diagnoses. Dr. Ophoven acknowledged that "there is voluminous literature supporting either side of [the] debate" regarding the effects of violently shaking a child. She also agreed that "there is a wide difference of opinion" regarding diagnoses of SBS and AHT. Moreover, the "debate" and "difference of opinion" regarding SBS and AHT existed at the time of Shelby's trial. The weight of opinion may have shifted by a matter of degree in the intervening years, but as the trial court found, SBS or AHT has not been "debunked" as a diagnosis. To the extent these issues are relevant in this case—which, again, involves blunt force injuries caused by an impact, not shaking alone—we cannot say that the trial court clearly erred by finding that the testimony of Shelby's experts would not probably produce a different result.

¶48. Ultimately, the PCR hearing was a battle of experts. Dr. Benton testified that the conclusions reflected in the autopsy and Dr. Riddick's testimony at trial—i.e., that Bryan died of blunt force injuries caused by intentional abuse—remained correct. Dr. Benton also testified at the PCR hearing that the multiple bruises on Bryan's head and Bryan's fatal

---

testimony regarding SBS and the timing of the fatal injury was unreliable and should have been excluded under Mississippi Rule of Evidence 702. *Id.* at *10-11 (¶¶46-49). The victim in *Clark* allegedly died of injuries caused by shaking alone and "had no external head injury evidencing an impact." *Id.* at *8 (¶41). Here, in contrast, Bryan suffered blunt force injuries from an actual impact, not just shaking. More important, though, in this PCR case we review the findings of fact and decision rendered by a trial court based on conflicting *but properly admitted* expert testimony regarding the cause of the child's death. The only issue in this appeal is whether the trial court's findings and decision are clearly erroneous.

injuries were inconsistent with a short fall. In addition, Dr. Benton testified that the alleged-but-undocumented seizure disorder could not account for Bryan's significant intra-cranial bleeding. Dr. Benton was a qualified expert witness, and he responded to each of the points raised by Shelby's experts.

¶49. The trial court considered Dr. Riddick's new testimony but found that the reasons for his change of mind were not supported by the evidence. The trial court also considered the testimony of Shelby's other experts, but the court found that Dr. Benton persuasively addressed their contentions and that their testimony as a whole did not undermine the evidence that supported the conviction. The trial court also found that Dr. Monson's new theory of a possible cause of Bryan's injuries—that Bryan stood straight up in bed in the middle of the night before falling head-first and unprotected to the floor—would not probably produce a different result in a new trial.

¶50. "When the evidence on a critical point is in conflict, the trial court sits as finder of fact in a post-conviction relief proceeding." *Henderson*, 769 So. 2d at 213 (¶8). "When conflicting evidence capable of more than one reasonable interpretation is presented to the court, the trial judge, as with any finder of fact, is entitled to determine the credibility of the witnesses and the weight to afford their testimony." *Dickerson*, 291 So. 3d at 353 (¶36). And we will not reverse the trial court's "finding of ultimate fact" in a PCR case "unless it is clearly erroneous." *Merritt*, 517 So. 2d at 520. Here, the trial court did not commit any clear error in finding that Shelby's new evidence would not probably produce a different

result in a new trial. Accordingly, the judgment of the trial court denying Shelby's PCR motion is **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE AND LAWRENCE, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J. WESTBROOKS, J., NOT PARTICIPATING.**

**McCARTY, J., DISSENTING:**

¶51. Because the pathologist's recanted opinion and scientific renunciation of the so-called "shaken baby syndrome" would "probably produce a different result or verdict in [a] new trial," the defendant's conviction must be reversed. This newly discovered evidence should be heard by a jury of Tasha Shelby's peers.

¶52. Just a few months ago, our Court emphasized how crucial expert testimony can be in the context of a case where an infant was allegedly murdered by her father. *Clark v. State*, 2017-KA-00411-COA, at *1 (¶1) (Miss. Ct. App. Oct. 29, 2019), *cert. granted*, 293 So. 3d 832 & 833 (Miss. 2020). At trial, the State theorized that the infant died as a result of SBS. *Id*. at *3 (¶13). No factual-witness testimony was presented regarding when and how the infant was injured. *Id*. at *7 (¶34). Instead, the State relied on its expert witness to support its theory of SBS. *Id*.

¶53. At trial, the defendant "attacked SBS's reliability with credible evidence, in the form of numerous cites to studies and peer-reviewed articles, that reflected the scientific community may no longer wholly accept SBS." *Id*. at *10 (¶47). The State's expert was unable to defend her SBS theory when confronted with the new literature. *Id*. at (¶46).

25

¶54. On direct appeal, we found that the trial court had erred in admitting the expert's testimony because it was unreliable. *Id*. at (¶47). "We further [found] the error of admitting [the expert's] testimony was magnified since [her] testimony as to those issues was the only evidence to support the State's theory of the case." *Id*.

¶55. We simply could not ignore the import of the expert's testimony. For "when an expert is allowed to testify about specific scientific knowledge or scientific methodology, the risk of prejudice is very high because such testimony may tend to mislead or tempt the jury to decide the case on an improper basis." *Id*. at *6 (¶32) (citing MRE 403 advisory committee note). Given the impact of the expert's testimony, and over a thoughtful dissent, we were compelled to reverse the conviction for a new trial. *Id*. at *11 (¶49).

¶56. Just as in *Clark*, the risk of prejudice in the trial below was undoubtably high. Dr. Riddick, the expert pathologist who had conducted the autopsy, was also the only expert to testify to a cause of death. Now that he has backtracked on parts of his opinion, we cannot have faith in the integrity of the verdict. Dr. Riddick's new opinion is in such conflict with his original testimony that he actually changed the manner of death on the death certificate—from "homicide" to "accident."

¶57. Without his testimony, the State does not have the support of a single pathologist in support of its theory of how the defendant caused the death of the child. The only other supporting evidence the State presented at trial was the testimony of Dr. Odom, who did not provide a cause of death. No other supporting witness, expert or factual, can now support

26

the State's theory that the child died as a result of SBS. While *Clark* was decided on direct appeal, I believe we must conclude as a matter of logic and precedent that the same result should be reached in this case.

¶58. Nor are the cases the majority relies upon compelling in the context of recanted expert testimony. In citing to *Turner* and *Howell*, our Court relies on general rules to suggest that express recantations are generally unreliable and do not "necessarily entitle [petitioners] to a new trial." *Howell v. State*, 989 So. 2d 372, 384 (¶33) (Miss. 2008). While this may be true in general, both the *Turner* and *Howell* decisions rested on circumstances that are remarkably different from the circumstances in Shelby's case.

¶59. In *Turner*, a witness initially testified at trial that the defendant sold him drugs. *Turner v. State*, 771 So. 2d 973, 974 (¶¶2-3) (Miss. Ct. App. 2000). Nearly three years after the defendant's conviction, the same witness attempted to recant his testimony by claiming that a sheriff, seeking to frame the defendant, had threatened and "coerced" the witness into testifying. *Id*. at (¶3). According to the witness, the sheriff had even fire-bombed his house as a warning. *Id*. Yet the Court found the witness's home was fire-bombed *after* he testified at the defendant's trial. *Id*. As a result, his testimony could not have been a result of fear. *Id*. at (¶5). Deeming him a "self-professed liar," the Court distrusted the witness, and his recanted testimony was found to be too unreliable to entitle the defendant to a new trial. *Id*. at 977 (¶12).

¶60. Conversely, the witness's recanted testimony in *Howell* actually did result in a new

27

hearing at the PCR stage. *Howell*, 989 So. 2d at 383 (¶32). In that case, a witness who testified at the defendant's murder trial recanted his testimony after the defendant's conviction, proclaiming "I have a very real and substantial reasonable doubt as to whether or not [the defendant] is the man I saw that morning[.]" *Id.* But the witness later withdrew that statement, explaining that he gave the statement during the week of his wedding and felt pressured by his pending marriage, investigators, and people associated with the defendant to make the statement. *Id.* at 383-84 (¶32). Based on the unreliability of his conflicting statements, the Court found that the *Howell* defendant was entitled to a PCR hearing. *Id.* at 384 (¶34).

¶61. Aside from *Turner* and *Howell*, other cases illustrate that our appellate courts have disregarded a witness's recanted testimony when the circumstances were similarly questionable. For example, the Supreme Court has opted to ignore a witness's later recanted testimony when that witness, an alleged accomplice of the defendant, admitted that he committed perjury while testifying against the defendant at trial. *Bradley v. State*, 214 So. 2d 815, 816 (Miss. 1968). The Court ultimately concluded that his initial perjured testimony rendered his subsequent recantation unreliable, and found that the defendant was not entitled to a new trial. *Id.* at 817.

¶62. Finally, the Supreme Court has examined a situation where several witnesses later recanted their trial testimony about an officer, claiming that they avoided fully telling the truth about the officer because "Internal Affairs" would "beat [them] and punish [them]" if

28

they did. *Russell v. State*, 849 So. 2d 95, 106-07 (¶¶12-13) (Miss. 2003). The Court, affirming that "[r]ecanted testimony [alone] does not entitle a defendant to a new trial," chose to consider the witness's repudiated testimony only in light of the surrounding circumstances. *Id*. at 107 (¶15). For "[t]o be persuaded by such recantations would be to place the control of the courts in the hands of corrupt witnesses who could by successive repudiations of their testimony cause the issue to oscillate at will, and make of perjury a basis for relief at the hands of the law which they had defied." *Id*. (quoting *Bradley*, 214 So. 2d at 817).

¶63. In light of the highly questionable circumstances surrounding the above cases, it is no wonder our appellate courts have expressed concern about the generally unreliable and suspicious nature of recanted testimony. Based on those facts, it was incumbent upon the Supreme Court to remind us that recanted testimony will not entitle a defendant to a new trial if to do so "would be to place the control of the courts in the hands of corrupt witnesses[.]" *Id*.

¶64. Historically, the cases above featured lay witnesses who were allegedly influenced to recant testimony based on some outside pressures. But in this case, we are not confronted with such questionable circumstances or with such a witness. We are not facing a "self-professed liar" or one who admits to having been unduly persuaded to recant his testimony. Neither are we confronted with a witness who admits to have perjured on the witness stand. Instead, we are faced with an expert witness who was qualified by his extensive experience,

29

expertise, and training to give a medical opinion for the jury's ears regarding Bryan's cause of death. This same qualified witness later provided an unequivocal admission to the court that new discoveries substantially altered his previous scientific findings and opinion as to Shelby's case. Therefore, it is obvious that we are not confronted with the same unreliable testimony that so quickly dissuaded previous courts from trusting and relying on recanted testimony. We should not rely on general rules about recanted witness testimony in a case where an expert witness makes a recantation.

¶65. Furthermore, I am not persuaded that Dr. Riddick's new findings equate to his naked, unsupported "belief" that Bryan suffered several seizures prior to his death and had a history of seizures in his family. Rather, it is learned that sufficient information from a reputable source upon which Dr. Riddick relied to alter his expert opinion.

¶66. In fact, based on those new findings, "Dr. Riddick's current opinion is that a seizure and a short fall are a 'better explanation' for Bryan's death than 'some form of intentional abuse.'" This conclusion resulted in the expert even officially amending the manner of death on the child's death certificate. This new opinion completely contradicts his trial testimony, wherein he declared with confidence that intentionally inflicted blunt-force trauma was the only viable explanation for Bryan's injuries and death. The jury had already been presented with evidence that Bryan had pre-existing bruises, that Shelby was the only person present at the time of his death, and that she allegedly said she felt she was dealing with a "retarded" child. It is unreasonable to believe that the jury was not tipped over the edge to pin Shelby

30

as a murderer when it heard from a trained expert that intentional blunt force trauma was the only explainable cause of Bryan's death. This is especially true when we consider that the testifying expert was not only the pathologist who performed the autopsy but was also the only expert witness to opine about a cause of death.

¶67. And as suggested by Dr. Riddick's new testimony, he would have never made such a conclusive statement had he known about Bryan's family history with seizures. Accordingly, it is highly likely that the jury's perspective and resulting decision would have been different if such a conclusive statement was never said. We should not be so confident to assume that this testimony was harmless and did not deprive Shelby of a fair trial, as our justice system requires.

¶68. When an expert witness recants pivotal testimony, we cannot be sure the guilty verdict rests on a firm foundation. Pivotal evidence, like Dr. Riddick's dramatic shift in his medical opinion, is that which directly impacts guilt or innocence. When a person's liberty is at stake, the person deserves an opportunity to face a jury in light of pivotal recanted testimony. We should defer to our system of jury trials to find the truth—not second-guess, from a cold record, what a jury might think.

¶69. The doctor's recantation must mean something. Sprawling wars are fought in litigation over the exclusion or admission of expert testimony, evidenced by thousands of pages of *Daubert* opinions from this Court and others.[10] The reason is because persuasive

---

[10] *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579 (1993).

31

expert testimony can win or lose a case. In Shelby's case, the stakes are just as high.

¶70.    In light of the recanted testimony of the core expert, and our own precedent in *Clark*, I believe our only course of decision is to reverse and remand for a new trial.

**McDONALD, J., JOINS THIS OPINION.**